15480

HOLLY HILL LUMBER COMPANY, INC., v. McCOY

(23 S. E. (2d), 372)

428

430

*Mr. L. D. Jennings* and *Mr. M. W. Seabrook,* both of Sumter, Counsel for Appellant,

*Mr T. B. Bryant, Jr.*, of Orangeburg, Counsel for Respondent,

Counsel for Appellant,

December 21, 1942.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE FISHBURNE:

This is a suit for specific performance of an executory contract—an option—to convey land, in which there was a decree for the plaintiff. Defendant appeals.

On July 15, 1941, the defendant, Addison E. McCoy, executed and delivered to the plaintiff, a corporation, an option based upon a valuable consideration, wherein he agreed to sell to the plaintiff a tract of land containing 560 acres, more or less, situated on Four Hole Swamp in Orangeburg County, for the purchase price of $10,000.00. The option was to be exercised on or before September 15, 1941. The plaintiff elected to purchase the land, and notified the defendant in person on August 29, 1941, of its readiness to comply, but the defendant informed the plaintiff that he would not perform the contract, and stated that he would not accept the purchase money. Thereafter, on September 2, 1941, this suit was brought.

The defendant admits the execution and delivery of the contract, but defends upon the ground that the option was obtained through the fraud and misrepresentation of the plaintiff, and that the purchase price is so grossly inadequate as to render the contract unconscionable. The cause was referred under a general order of reference to the Honorable John S. Bowman, Judge of the Orangeburg County Court, as Special Referee, who, after holding several references, filed a full report and recommended that specific performance be ordered. Upon exceptions being taken to the Circuit Court, a decree was issued on July 6, 1942, in which the Referee's report was confirmed in all respects, and the defendant was ordered and directed to specifically perform the contract in accordance with its terms.

The gist of the defense is that there is a large and valuable lime deposit on the tract of land in question which lies from six to fifteen feet beneath the surface; that the defendant was ignorant of this fact when the option was given; that the plaintiff was fully apprised of the existence of the lime bed, which greatly enhanced the value of the property, and not only concealed this knowledge from the defendant, but made false representations thereabout which in effect lulled him to sleep.

For an understanding of the questions involved a statement and discussion of the facts becomes necessary.

The defendant had owned the tract of land for many years, having inherited it from his father, and it was used by him for agricultural purposes. Some time in the year 1936, he sold all of the timber situated thereon to the plaintiff. The tract originally contained 610 acres, but in 1937, the defendant sold and conveyed to the plaintiff 50 acres thereof for the sum of $1,000.00. This 50-acre tract was incorporated by the plaintiff as a part of its mill site, upon which a large lumber mill was operated. It appears that in addition to the mill site, the plaintiff owned a large body of land—over 10,000 acres—adjoining and almost surrounding the 560-acre tract which is the subject of this action.

In view of the contentions made by the defendant, it is interesting to note who took the initiative with reference to the sale of the property. In 1937 or 1938, the defendant commenced the operation of a laundry business in the City of Orangeburg, and feeling the need of more capital, he went to the home of Mr. L. E. Miller, president of the plaintiff at Holly Hill, and endeavored to sell him the 560 acres in question for the sum of $3,500.00 but in his testimony he said that he would then have accepted therefor $2,500.00 in cash. The offer of sale was not acted upon at that time by the plaintiff because of its lack of financial ability. However, the matter was not dropped, and later on, and through the years, the parties resumed and continued negotiations for the sale and purchase of the premises. On several occasions the defendant was interviewed by the plaintiff's attorney, and at other times by Mr. Miller, with reference to the sale. About eighteen months prior to the execution of the option, negotiations became active. The defendant was offered $5,000.00 for the property, then, some months later, $7,500.00. The defendant finally fixed the purchase price at $10,000.00, and this agreement was embodied in the option contract executed on July 15, 1941.

Mr. Miller in his testimony, while admitting that the possibility of a lime deposit on the land was one of the factors which influenced the plaintiff in making the purchase, gave as the controlling reasons for acquiring the property: First, it was adjacent to the mill site and mill property of the plaintiff; second, the desire for elbow room; third, the connecting up of very large adjacent properties which practically surrounded this tract; fourth, the prevention of encroachment upon their real estate holdings; fifth, the obtaining of pasture lands for a cattle and hog farm so as to have a supply of fresh meats for the company store; and, sixth, unimpeded rights-of-way across the 560-acre tract of land for business operations.

The Special Referee found that the possibility of a lime deposit was a factor considered by the plaintiff. But he held that the reasons stated above were the actual and controlling considerations which moved the plaintiff in wishing to purchase the defendant's property.

Mr. McCoy contends that the plaintiff had full knowledge of the presence of the lime deposit on the land and of its great value, and not only fraudulently concealed this fact from him, but made certain false representations concerning it, which induced him to enter into the contract. From a careful consideration of the evidence, we agree with the Referee and the Circuit Court that the plaintiff's conduct is not open to this charge.

After the execution of the option, the plaintiff, openly and without secrecy, had holes bored on the property for the purpose of definitely ascertaining the existence and depth of the lime deposit. The testimony shows that while the information may not have been widespread, yet quite a number of people in the Holly Hill section, where the land is located, knew that a substratum of lime was present in that area. In fact, the Atlantic Lime Corporation was mining and manufacturing lime at its plant located within a half mile of defendant's property, and had been so engaged for

nearly two years before the defendant executed the option contract. The defendant, however, although this manufacturing plant was in sight of his property, and although he visited his farm once a week, disclaimed knowledge of the fact that lime was actually being mined there. And this knowledge is denied although Mr. Cope, the managing supervisor of the lime plant, a witness for the defendant, testified that he had given wide publicity and advertisement to the operation of his manufacturing plant.

Several months before the execution of the option contract, Mr. Sam McCoy, a brother of the defendant and a prominent business man at Holly Hill, told him of the existence and operation of this lime plant near his property. But the defendant says that he received the impression that it was a fertilizer plant, and that the lime used in connection therewith was not dug from the ground. It appears from his testimony that his interest was finally awakened to the presence and value of the lime deposit on his place when he observed flakes of lime on the edges of the holes bored by the plaintiff. He then made inquiries and reached the conclusion that his land was worth far more than he had agreed to sell it for. When the holes were bored, according to Mr. Miller's testimony, the plaintiff had no certain knowledge of the presence of the lime deposit, and had never thereafter submitted samples of the soil for a laboratory test.

The general doctrine with respect to concealment or non-disclosure as a form of actual fraud may be stated as follows: If either party to a transaction conceals some fact which is material, which is within his own knowledge, and which it is his duty to disclose, he is guilty of actual fraud.

Professor Pomeroy (Pom. Eq. Jur., Vol. 2, Sec. 901), says: "It is certain that every concealment or failure to disclose material facts known to one party is not fraud in equity or at law, whatever quality it may have before the tribunal of the individual conscience. It has never been

contended, in our system of jurisprudence, that a vendor in a contract of sale is bound to disclose all facts which, if known by the buyer, would prevent or tend to prevent him from making the purchase. Much less has it ever been maintained that the buyer is bound to discover all facts known to himself which would enhance the value of the article sold or affect the conduct of the vendor."

Non-disclosure becomes fraudulent only when it is the duty of the party having knowledge of the facts to uncover them to the other.

And this brings up the question, when does such duty rest upon either party to any transaction? The duty to disclose may be reduced to three distinct classes: First, where it arises from a pre-existing definite fiduciary relation between the parties; second, where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The third class includes those instances where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties. Such, for instance, as a contract of insurance. Pom. Eq. Jur., Vol. 2, Sec. 902; Pom. Eq. Rem., Vol. 2, Sec. 784.

As instances of concealment appear most frequently in contracts of sale, it would be proper to apply the foregoing general doctrine to the vendee and the vendor. The conclusion is clearly established by the decisions that under ordinary circumstances, there being no previously existing fiduciary relation between the parties, and no confidence being expressly reposed by the vendor in the vendee with reference to the particular transaction, no duty rests upon the vendee to disclose facts which he may happen to

know advantageous to the vendor, facts concerning the thing to be sold which would enhance its value or tend to cause the vendor to demand a higher price, and the like; so that failure to disclose would not be a fraudulent concealment. The reason is evident. If it were otherwise, such a principle must extend to every case in which the buyer of an estate happened to have a clearer discernment of its real value than the seller. It is, therefore, not only necessary that great advantage should be taken in such a contract, and that such advantage should arise from superiority of skill or information; but it is also necessary to show some obligation binding the party to make such a disclosure. Of course, each case must depend upon its own circumstances.

The testimony in the case at bar does not show, nor is the claim made, that any fiduciary relationship existed between the plaintiff and the defendant, or that the defendant expressly reposed any trust or confidence in the plaintiff. Nor does the essential nature of the contract itself call for a full disclosure. The parties were dealing at arms' length. Both Mr. Miller, the president of the plaintiff, and Mr. McCoy, the defendant, were business men of experience and capacity. They had had previous business dealings with each other, and each was well known to the other. In the negotiations the defendant as a vendor attempted to get the most advantageous price obtainable for his property, and fixed the purchase price at $10,000.00, which he believed was far more than it was worth. And it is certainly clear that the defendant in entering into the contract acted freely and upon his own judgment.

In the effort to show what might be termed guilty knowledge and bad faith on the part of the plaintiff concerning the lime deposit and the likely establishment of manufacturing plants for the mining of this product, the plaintiff offered evidence from Mr. W. P. Jacobs, of the South Carolina Planning Board. An examination of this testimony, however, does not satisfy us that it supports the defendant's

contention. Mr. Jacobs testified that upon his own initiative, a week or two prior to July 15, 1941—the date of the option—he sought an appointment with Mr. Miller, as a result of which he had a conference with him in his office at Holly Hill. It appears that the planning board was engaged in locating a special type of clay soil in the State, with special reference to the possibility of interesting outside capital in the building of a cement plant. The evidence tends to show that clay found on the property of the defendant is highly suitable for the manufacture of cement, but it is not shown that the plaintiff possessed this knowledge. Mr. Jacobs stated that the engineers with whom the planning board had been in communication, estimated that it would cost two million dollars to build a plant with a capacity of a million barrels of cement per annum; and that it was in the highest degree desirable that such proposed plant be located on a navigable water route in order to get lower transportation rates. It was developed, however, from the testimony of Mr. Jacobs, who was mainly engaged in promoting and publicizing the natural resources of the State, that the planning board had so far been unable to interest foreign capital in locating a cement plant in South Carolina, and that the prospect for the future was not bright along this line—especially so in view of uncertain world conditions and the present difficulty of obtaining a priority for the purchase of building material. He did not seek any option on the property of the plaintiff. With reference to the outlook for the development of a lime industry, Mr. Jacobs stated that a California company largely engaged in the mining and manufacturing of lime, and owning a tract of 320 acres at Jamestown, not far from Holly Hill, had never undertaken to develop the Jamestown property, but on the contrary was trying to sell it, and had found no bidders.

The testimony which we have narrated, and the inferences which may be drawn therefrom, do not sustain a charge of fraud on the part of the plaintiff. Nor does the testimony of Professor J. Lincoln Moore, a

chemical engineer connected with the South Carolina Defense Council, tend to establish fraud on the part of the plaintiff on the theory of concealment. He testified that he was engaged in prospecting for the defense council, and on his own motion saw Mr. Miller, on July 5th. Mr. Moore was seeking information as to who would be a competent person to engage in boring on properties where it was believed a lime deposit existed. Mr. Miller suggested Mr. H. E. Reeves, of Cottageville, a successful borer of artesian wells. A meeting was arranged between Mr. Miller, Mr. Reeves, and Mr. Moore for July 10th, and it appears that Mr. Moore on this occasion told Mr. Miller that the defense council was interested in obtaining options on land with a lime deposit, but did not disclose prices; he left with him a printed form of option wherein it was provided that the purchase price of optioned land would not be less than $50.00 per acre, and not more than $150.00 per acre.

While the rules of equity which we have hereinabove stated, as they relate to fraud and concealment on the part of a vendee, are generally recognized and accepted by the Courts, it is agreed that an informed vendee must limit himself to silence in order to escape the imputation of fraud. If in addition to the party's silence there is any statement, even in word or act on his part, which tends affirmatively to a suppression of the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, the line is overstepped, and the concealment becomes fraudulent.

It is upon the foregoing principle of equity that the defendant largely relies, and he points to the following testimony as being conclusive to show fraud. When the defendant, Mr. McCoy, was being cross examined, this testimony was elicited:

"Q. Counsel asked Mr. Miller if he did not tell you when he was trying to get the option, if he told you it (Atlantic Lime Corporation) was in the hands of the receivership?

A. Yes. I asked him 'How about that lime plant?' He said, 'Don't think it will amount to anything, it is in the hands of the receiver.' I had a vague idea about the lime plant."

It is argued that this testimony shows that Mr. Miller overstepped the line, afirmatively suppressed the truth, and was guilty of concealment amounting to fraud. But this deduction escapes us. Mr. Miller had already testified that he assumed that the defendant knew as much about the land and its possibilities as he did, and probably more. He certainly said nothing with reference to the presence or absence of a lime deposit on the defendant's place. What he did say expressed the full truth. The Atlantic Lime Corporation was in the hands of a Receiver, and was subsequently sold under an order of the Court. If it may be deduced from the question, "How about that lime plant?" that the inquiry embraced some idea of a future development of lime industries in the community, then Mr. Miller's answer did not fall short of the truth when he said, "Don't think it will amount to anything," because there has been no industrial development established for the mining and manufacture of lime, nor have any options secured by the defense council in the territory around Holly Hill been exercised.

We think it may be inferred that the question asked by the defendant not only related solely to the status of the Atlantic Lime Corporation's plant and its operations, but it reasonably signified some knowledge of that company's activities possessed by the defendant. Logically, the question, "How about that lime plant?" asked by a party who was then negotiating the sale of his land lying only a half mile away, clearly indicated some thought in his mind connecting his property and its potentialities with the operation of the lime company's plant.

It is not reasonable to conclude that the conversation between the parties above quoted, with reference to the Atlantic Lime Corporation, in view of the avenues of knowledge open to the defendant, could have

operated to mislead him or to induce him to enter into the open contract.

The defendant further contends that specific performance should not be adjudged because the purchase price of $10,000.00 is inadequate, so grossly inadequate as to show fraud.

If there is nothing but mere inadequacy of price—no disability being invoked—the case must be extreme in order to call for the interposition of equity. Where the inadequacy does not stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted.

"When the accompanying incidents are inequitable and show bad faith, such as concealment, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other—these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative." Pom. Eq. Jur., Vol. 2, Sec. 928.

It was held in the early case of *Gasque v. Small,* 2 Strob. Eq., 72, 21 S. C. Eq., 39: "The inadequacy must not be measured by grains, but it ought to be palpably disproportioned to the real and market value of the property, so as to constitute a hard, unreasonable, and unconscionable contract; but it is not necessary that it should be so gross as to excite an exclamation or to indicate imposition, oppression or fraud, for this would be sufficient ground not only for refusing a specific performance but for rescinding the contract."

The *Gasque case,* however, involved the contract of a young man who had just reached maturity, and who had been overreached and prevented from seeking the counsel of his friends.

The Special Referee on this phase of the case held: "I find from the testimony in the case that the lime deposit has no present or immediate value in excess of the amount

of the agreed consideration, and that the prospective value attributed to it is dependent upon so many factors that do not now exist, and which may never come into existence that to give it a value in excess of the contractual value, would require the Court to enter the field of speculation, surmise and conjecture, which it is not permitted to do."

In this finding the Circuit Court concurred, and we see nothing in the evidence which would warrant us in adopting a different view.

To establish a gross inadequacy of price, the defendant largely relies upon the evidence given by Dr. F. H. H. Calhoun, Dean of the School of Chemistry and Geology of Clemson College, and by Professor J. Lincoln Moore, Chemical Engineer of the South Carolina Defense Council. From their testimony, it may be gathered that a substratum of lime not only underlies the defendant's land, but runs throughout a large portion of the coastal region of South Carolina; that the feasibility of industrial development depends mainly upon the nearness of the lime deposit to the surface of the earth; that the lime deposit on the McCoy land is a little richer and purer than any other found in the Holly Hill section, and lies within six to fifteen feet of the surface; that a cement plant would cost from $500,000.00 to $700,000.00; that a plant for the manufacture of dry ice or other products obtainable from lime would cost from $40,000.00 to $50,000.00. But the Industrial Development Committee of the South Carolina Planning Board recommended Webb Creek, near Creston, in this State, as a place where a cement plant could be operated most profitably.

These witnesses—Dr. Calhoun and Professor Moore—said they would recommend a price per acre of $50.00 to $150.00 for the McCoy land to any person or outside capitalist who would be interested in establishing a plant for the utilization of the lime. But neither of these gentlemen knew of anyone who would venture capital in such an investment, and stated that water and rail transportation are

essential to the development of the lime industry. The McCoy land is not on a railroad, nor on navigable water. The burden of the testimony along this line was that the price suggested by Dr. Calhoun and Professor Moore for the McCoy land—that is, $50.00 to $150.00 per acre—represented its potential value, and that before either price could be realized some individual or corporation with large capital would have to be found who would be willing to risk money in the enterprise. They frankly stated that many factors affecting the value of the land would have to be considered.

The McCoy tract consists of about 125 acres of high land; the balance is in the swamp. The testimony conclusively shows that the substratum of lime in the swamp could not be profitably mined because it is below water level, and for this reason its value is negligible. Practically all of the local witnesses who testified as to value, said that the McCoy land was worth about $4,000.00 if devoted exclusively to farming purposes; that if the lime content were alone considered, the sum of $10,000.00 would represent its full market value. If the portion of the tract consisting of high land, *viz.*, 125 acres, being deemed the most valuable from the standpoint of mining lime, be multiplied by eighty dollars per acre, we get $10,000.00, which, under the testimony, is certainly not grossly inadequate.

At the oral argument of this case before us, counsel for the defendant, upon due notice, submitted a motion that an offer made by Mr. J. Ross Hanahan, of Charleston, for the McCoy property, of $25,000.00, be incorporated in the record for appeal for our consideration, or else that the cause be remanded to the Court below so that evidence of this offer might be taken and considered along with the evidence already in the record. Attached to the motion papers was a contract executed by Mr. Hanahan that he would pay the sum of $25,000.00 for a marketable title.

It is suggested that this offer constitutes newly discovered evidence. It appears, however, from an affidavit submitted by counsel for the plaintiff, that when he was making his argument before the Special Referee on the subject of valuation and adequacy of price, Mr. McCoy, the defendant, who was present, interrupted the argument and made the following remark: "Mr. Hanahan will give $25,000.00 for the property." So that it is apparent that while the matter was still pending before the Special Referee, it was known to the defendant that Mr. Hanahan was willing to give a larger price for the property. But aside from this, we are not disposed to remand the case. Even if we consider this belated offer as incorporated in the record, it will not affect our conclusion that the decree of the lower Court should be upheld. In the light of all of the evidence, it would be most reasonable to infer that this offer is based upon speculation, which is not favored in equity.

The alleged inadequacy of price to be paid by the plaintiff is not accompanied by any inequitable incidents, as we view the evidence, nor is the price so palpably disproportioned to the real and market value of the property as to constitute an unconscionable contract.

The question of adequacy of price must be considered as of the date of the contract, and the subsequent enhancement in value would not justify refusal of specific performance. *Shannon v. Freeman,* 117 S. C., 480, 109 S. E., 406.

The discretion to grant or refuse specific performance is not an arbitrary or capricious one, but a judicial discretion, to be exercised in accordance with the special rules and practices of equity, and with regard to the facts and circumstances of the particular case. *Masonic Temple v. Ebert,* 199 S. C., 5, 18 S. E. (2d), 584. It was never intended to substitute the judgment or business sagacity of the chancellor for that of the contracting party and to relieve one of a supposed bad bargain when fairly

entered into. Nor was it intended to deprive one party of the gain which had accrued to him by the changing circumstances of the future, which his foresight had anticipated or which fortune had thrown in his way. The defendant in the case at bar was under no disability; was fully competent to transact his affairs, and, in our opinion, cannot successfully plead fraud under the facts in this case, in the light of his own testimony. As .we view it, the report of the Special Referee, confirmed by the Circuit Court, is not against the preponderance of the testimony.

Dealing with a preliminary matter of pleading, the defendant assigns error because when this cause came on to be heard before the Circuit Court, the trial Judge permitted the plaintiff to amend his complaint so that instead of alleging tender he was permitted to allege waiver of tender. In doing this the Circuit Court committed no error, and the defendant has suffered no prejudice. The Special Referee allowed, over objection, testimony showing that the defendant had repudiated the contract under circumstances which relieved the plaintiff of making an actual tender in cash of the balance of the purchase price. The testimony showed conclusively as stated by the Circuit Judge in his decree, a repudiation of the option and a refusal to accept payment of the balance due. It is only necessary to ·cite the following authorities to show that the Circuit Judge committed no error in permitting the complaint to be amended to conform to the proof: *Metts v. Wenberg,* 158 S. C., 411, 155 S. E., 734; *Fischer v. Chisolm,* 159 S. C., 395, 157 S. E., 139; *Carolina Hdw. Co. v. Raleigh Banking & Trust Co.,* 169 N. C., 744, 86 S. E., 706.

Nor did the Court err in granting a general order of reference and overruling the defendant's motion to frame issues under Section 593, 1942 Code. This was in the sound judicial discretion of the Circuit Judge, and it does not appear that it was erroneously exercised. *De Loach v. Sarratt,* 55 S. C., 254, 33 S. E., 2, 10, 35 S.

E., 441; *Cantey v. Summersett & Co.,* 138 S. C., 151, 135 S. E., 875, 876; *Erskine v. Erskine,* 107 S. C., 233, 92 S. E., 465, 469; *Neal v. Suber,* 56 S. C., 298, 33 S. E., 463, 465; *Hammond v. Foreman,* 43 S. C., 264, 21 S. E., 3, 4.

Finally, it is suggested that if the judgment of the lower Court be affirmed and specific performance required, the inchoate dower interest of the defendant's wife will be outstanding; and that if Mrs. McCoy should refuse to renounce dower the defendant would be unable to give the good and marketable title which he contracted to give. We shall not attempt to meet a situation which is not now before us. There is no evidence in the record that the wife of the defendant will refuse to renounce dower. If such situation should develop, the parties will doubtless seek an appropriate remedy in the lower Court.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM, MESSRS. ASSOCIATE JUSTICES BAKER and STUKES, and CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE, concur.