**Samuel C. CRAVEN, Plaintiff,**

**v.**

**Martha Seele WILLIAMS, Defendant.**

**No. CA/67–807.**

United States District Court
D. South Carolina,
Charleston Division.

Aug. 13, 1969.

---

Coming B. Gibbs, Jr., Charleston, S. C., for plaintiff.

Edward D. Buckley, Bailey & Buckley, Charleston, S. C., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER

DONALD RUSSELL, District Judge.

This is a suit for specific performance of an alleged contract of sale covering approximately eighty-three (83) acres of land located at Lincolnville, near Summerville, South Carolina.

The complaint is in the usual form. The defendant, in resisting specific performance, denied the existence of a completed contract and, in the event the Court finds a contract, she pleads inadequacy of consideration, coupled with other "incidents", and violations by the plaintiff of certain rules applicable to real estate agents under the laws of South Carolina, as bars to the relief of specific performance.

Defendant also filed a cross-complaint asking that she be declared the sole owner of the property involved herein, but she withdrew it at the trial of the case.

On this state of the pleadings, the action came on for trial before me without a jury at Columbia, South Carolina, on May 7, 1969. After hearing the testimony and after due consideration of the depositions, taken by the parties and introduced without objection as a part of the record, I make the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The plaintiff is a lawyer practicing in Charleston, South Carolina. He grew up in the general area where the land involved in this action is located. Real estate in that area has been increasing markedly in value in recent years. Plaintiff was familiar with this development. He has accordingly actively sought for several years prior to his dealings with the defendant to purchase land in the area, intending generally to resell it advantageously on the advancing market. Plaintiff's purchases were normally made for his own account, though other members of his family were similarly engaged in seeking to acquire land in this general area. For instance, the plaintiff purchased from an owner living in Philadelphia a year or two before he began negotiations with the defendant, a tract in the same neighborhood for $25 per acre, which less than a year later he sold for $150 per acre. He indicated, also, that he had made other offers for land in the neighborhood at prices ranging from $100 per acre to $450 per acre.

2. The defendant, who at the time of trial was seventy-two years of age, was born near Charleston, and grew up on the land involved in this action. She was educated at Tuskegee Institute and took special work in dietetics and child care at Pratt and New York Universities. She apparently moved to New

York after leaving Tuskegee Institute and has remained there since, returning, if at all, only occasionally to South Carolina. In the early 1950s, she was adjudged incompetent and "confined to a mental institution". She remained so committed until either 1961 or 1962, the plaintiff being uncertain of which year.[1] She was then restored to a status of legal competency, though for a year after her release from confinement, she was required to report monthly to the mental institution from which she had been released. Thereafter she has continued to consult a psychiatrist.

3. The land involved in this action consists of approximately eighty-three (83) acres, located on the edge of the town of Lincolnville, in Charleston County, South Carolina. It was originally owned by the father of the defendant. Upon the father's death, it descended to the mother and at her death to the defendant and her brothers and sisters.[2] The defendant had some difficulty with her brothers about the property. The land was unoccupied but the brothers, according to the defendant's statement in a letter to the plaintiff, had sold some timber off the property, without making any settlement with the defendant. Taxes became delinquent and the property was sold at a tax sale, where the defendant bid in the land. Defendant's title rests on this tax deed executed June 11, 1938. In her answer the defendant claimed that she has since held the property adversely to all her brothers and sisters, nieces and nephews; no proof of such adverse possession was offered at trial.

4. So far as the record shows, the defendant had not visited the property in several years prior to her negotiations with the plaintiff; she consulted no knowledgeable person on its value and seems to have acted largely on intuition as to its value in any negotiations with plaintiff.

5. In the fall of 1963, a brother of the plaintiff ascertained from the tax books that the defendant owned the property involved here. At the brother's instance, the plaintiff wrote the defendant on October 2, 1963, that he had "a client who is interested in purchasing * * * the entire acreage" and inquired "the amount you desire per acre". The defendant replied by a letter dated September 9, 1963, but postmarked October 8, 1963, in which, disregarding the plaintiff's expression of interest in "the entire acreage" and requesting a price fixed by the acre, she stated that she was "not selling the property by the acre, I am selling it as one parcel". She added that a broker whom she had consulted wanted 10% commission and inquired whether the plaintiff was a broker willing to act for a 6% commission. Immediately, on receipt of this letter, plaintiff answered, restating his "client's" interest "in purchasing the entire tract" and emphasizing that he only wanted "to know the price and how many actual acres that you (she) have (has)." He concluded with the statement that he would be "glad to handle this matter for only 6%" and pressed the defendant to "advise me (him) by return mail as to your price".

6. On October 15, 1963, the defendant wrote the plaintiff that she could not give "a price for the property at this time, as I must have it surveyed". She referred to the fact that she had been sick "for a long time" but did not indicate the nature of her illness. She seemed particularly interested in securing an accounting with her brothers for timber sold off the property and inquired whether the plaintiff as a lawyer would look out for her interests in that regard.

7. A little over a month later, on December 23, 1963, the plaintiff again wrote the defendant. At the outset, he stated he had looked into the recovera-

---

1. In her answer she alleged that she was adjudicated competent on November 15, 1961, but on trial she was indefinite as to the date.

2. The mother died January 9, 1939.

bility of her claims against her brothers and expressed the opinion that nothing could be realized thereon. He then reiterated his continuing interest in purchasing the land at Lincolnville. In this letter, he, for the first time, indicated obliquely he was the party interested and not a client. He told the defendant that he would arrange for the survey and that all he wanted to know was "the price per acre that you desire for the property", concluding that, when this is arranged, *"then all the incidental matters can be worked out"*. (Italics added) He added that he "personally" felt "a price between $75.00 and $100.00 per acre would be reasonable, under the situation".

8. Immediately on December 27, 1963, the defendant replied that she had "contacted another Lawyer" about her claims against her brothers. She disclaimed any willingness to sell her property for $100 per acre, pointing out that her father paid more than that for the property in 1898. She informed the plaintiff that "five people" had made offers for her property but she expressed no interest in a sale. stating she would "rather sell trees and keep land".

9. Then, on August 4, 1964, the defendant wrote the plaintiff, referring to the latter's interest on behalf of a client in her property, stating her failure to remember the amount of plaintiff's prior offer, and concluding:

"I am asking $150.00 per acre and will take back 1st Mort at 6% monthly or quarterly payments and my Lawyer will draw up Contract."

Two days later, the plaintiff replied that he "accept(ed) your (her) offer of the sale of your (her) land as stated in your letter of August 4th, 1964, for the amount of $150.00 per acre. Please have your lawyer draw the contract * * *." He referred to the fact that her so-called "offer" was for a credit sale but added, "however, *you did not set out the amount of down payment, if any.*" (Italics added)

It is these two letters of August 4 and August 6, which the plaintiff contends created a contract of sale between the plaintiff and the defendant, the specific performance of which is sought in this action.

10. After the exchange of these two letters, which represent the basis of plaintiff's case, there were repeated efforts on the part of the plaintiff to secure from the defendant or her New York lawyer a written contract of sale. In an effort finally to secure a contract with all the terms set forth, the plaintiff himself prepared a contract of sale and forwarded it to the defendant by letter dated September 2, 1964. This form fixed the down payment as ten per cent. of the purchase price. It provided for a purchase money mortgage securing the balance. The property was to be surveyed and the contract was subject to a title check. The plaintiff explained his insistence on a formal contract by observing that he knew some of the complications surrounding titles in the Lincolnville area and "that is why I have gone to the trouble to prepare this Contract, so that everything will be legal and we can begin to check the title." (Italics added)

11. The defendant promptly replied that she had turned the contract prepared by the plaintiff over to her lawyer. About three weeks later, she wrote the plaintiff that her lawyer disliked the contract submitted, especially the provision requiring her to pay plaintiff a broker's fee, and indicated that her lawyer preferred to draw a contract. The plaintiff answered by requesting the defendant to have her lawyer draw the contract. However, some three weeks later, an attorney in New York, after identifying himself as a lawyer for the defendant, advised the plaintiff that his client rejected plaintiff's offer as "insufficient both in respect to price and terms". Upon receipt of this letter, the plaintiff on October 27, 1964, wrote the defendant's lawyer, contending that the defendant's letter of August 4, 1964, represented an offer to sell, which he

had unconditionally accepted in his letter to the defendant dated August 6, 1964, and that such offer, so accepted, represented a valid contract. He demanded that the defendant forward him a completed contract of sale "on or before November 6th, 1964, or I shall immediately file suit for specific performance".

12. At this point, the parties became involved in an argument over the validity and extent of defendant's title. Defendant demanded that the plaintiff accept a quitclaim deed and plaintiff countered equally strongly that his offer was based on a complete marketable title. As the argument continued, the plaintiff finally suggested on November 30, 1964, that a title search be had and the exact nature of defendant's title ascertained, after which "we will renegotiate, as to the purchase price" since he must "know her (the defendant's) interest before I (the plaintiff) could possibly set a price". At about this point, the defendant discharged her New York lawyer and renewed correspondence with the plaintiff, advising him that her niece who has some interest in the property wants $200 per acre. She adds somewhat cryptically that she had only written the plaintiff "to get information". Finally, on August 23, 1965, more than a year after the exchange of letters which the plaintiff argues represented a completed contract between the parties, the plaintiff talked by telephone with the defendant and on that date wrote the New York attorney for the defendant, stating that he had agreed with the defendant on the terms of the sale and had agreed that her New York attorney (whom she had advised the plaintiff several months earlier she had discharged) would draw up the necessary contract. The sale was to be on credit, with a cash payment of ten per cent. Annual principal curtailments would be ten per cent. of the original sale price, until purchase price is fully paid. Interest on unpaid balance was to be at six per cent. per annum. The defendant was to give only a quitclaim deed, with the understanding that her interest in the land was at least fifty per cent. The price per acre was $150. The file indicates no reply to this letter from the New York lawyer or the defendant. Finally, some two months later, the plaintiff writes the defendant that he has heard nothing from her and inquires "what is taking place". On this letter, correspondence between the parties ends and this suit followed.

13. It should be stated that the plaintiff did not know of the defendant's mental disability. While he, of course, had knowledge far superior to that of the defendant on the value of land in the Lincolnville neighborhood, he negotiated in good faith with the defendant, seeking naturally a bargain if he could secure it.

14. I find the value of the land in question, as of August, 1964, to be approximately $450 per acre. In reaching this value, I have considered carefully the testimony of the real estate appraisers offered by the respective parties. The plaintiff himself was fairly indefinite in his valuation of the land. I think it is a fair deduction from both his testimony and his conduct during the negotiations that he felt the property had a value far greater than $150 per acre. The very fact that he was willing to pay that sum for a quitclaim deed, assuring him only a fifty per cent interest, verifies that conclusion. The expert witnesses for the defendant gave values ranging from $600[3] to $900 per acre. It may be their estimates of value are more accurate than the lower figure I have accepted. I have, however, chosen the more conservative figure, which represents in my judgment, based on the evidence in the case, including even the

3. The expert using this lower figure stated that it was based on a cash sale. He testified that if the sale was on credit, his valuation would be $800 per acre. Since the instant sale was to be on credit, it perhaps would be more accurate to use the higher estimate.

testimony of the plaintiff, a minimum valuation as of August, 1964.[4]

15. The correspondence between the parties, as well as the conversation between them as detailed by the plaintiff in his letter to the defendant's New York attorney, always contemplated a credit sale. At no time was there a mention of a cash purchase. Neither did the plaintiff ever indicate any disposition to make a cash purchase nor did the defendant show any interest in such a sale.

## CONCLUSIONS OF LAW

█ 1. There exists requisite diversity of citizenship and amount in controversy[5] to support the jurisdiction of this Court under Section 1332, 28 U.S.C.A.

2. The initial issue in this case is whether the two letters of August 4 and August 6, 1964, the first written by the defendant and the latter by the plaintiff, represented a completed contract which will sustain an action for specific performance.

█ 3. It is settled law in this State that a valid contract may be made by an exchange of correspondence. Neufville v. Stuart (1833) 1 Hill.Eq. (10 S.C.Eq.) 159; Holliday v. Pegram (1911) 89 S.C. 73, 80, 71 S.E. 367; Oe-land v. Kimbrell's Furniture Co., Inc. (1947) 210 S.C. 223, 227, 42 S.E.2d 228; Speed v. Speed (1948) 213 S.C. 401, 408, 49 S.E.2d 588. "But" as the Court cautioned in the Holliday Case, "care should always be taken not to construe as an agreement letters which the parties intended only as a preliminary negotiation." (p. 80, 71 S.E. p. 370) Certainly, it will not constitute a contract, if the correspondence is "indefinite, uncertain or ambiguous or does not embrace all the material terms" of the agreement,[6] or was not intended by the parties to be a full and complete agreement between the parties.[7] Neff v. World Publishing Co. (C.C.A.8 1965) 349 F.2d 235, 248, states the appropriate rule with clarity:

"In the law of contracts the intent of the parties must be looked to and a contract is not made so long as both parties anticipate that something remains to be done to establish contractual relations. * * *

    * * * * * *

" 'To create a contract, then, the minds of the parties must meet as to every essential term of the proposed contract, and there must be a clear and unequivocal acceptance of a certain and definite offer in order that a mere agreement may become a contract. Therefore, it is necessary among other things, that the minds of

4. In actions for specific performance, valuations are to be as of date of alleged contract. Holly Hill Lumber Co., Inc. v. McCoy (1942) 201 S.C. 427, 445, 23 S.E.2d 372.

5. Amount in controversy in an action for specific performance is the value of the property involved. Ebensberger v. Sinclair Refining Co. (C.C.A.5 1948) 165 F.2d 803, 805, cert. den. 335 U.S. 816, 69 S.Ct. 35, 93 L.Ed. 371. In this case the value of the land is considerably in excess of the jurisdictional amount under the valuations made by both plaintiff and defendant.

6. Maxwell v. Standard Furniture Co. (1923) 127 S.C. 225, 233, 120 S.E. 834; Anderson v. Hall (1930) 155 S.C. 320, 322, 152 S.E. 521; Holly Hill Lbr. Co. v. Federal Land Bank (1931) 160 S.C. 431, 436, 158 S.E. 830; Savannah Guano Co. v. Fogle (1919) 112 S.C. 234, 238, 100 S.E. 59; Laseter v. Pet Dairy Products Co. (C.C.A.4 1957) 246 F.2d 747, 750. Compare, McLaurin v. Hamer (1932) 165 S.C. 411, 420, 164 S.E. 2, and Frank Bowman Co. v. Lecato (C.C.A.4 1923) 292 F. 73, 77, as well as Boozer v. Teague (1887) 27 S.C. 348, 363, 3 S.E. 551; and Peay v. Seigler (1897) 48 S.C. 496, 511, 26 S.E. 885.

7. See Holliday v. Pegram, supra, where the Court put it that the question is, "[d]id they mean to contract by their correspondence, or were they only settling the terms of an agreement, into which they proposed to enter, after all its particulars were adjusted, which was then to be formally drawn up and by which alone they designed to be bound?" (89 S.C. p. 80, 71 S.E. p. 370)

the parties meet as to the essential terms of the proposed contract.' "

■ While it is sometimes stated that the invalidation of contracts for indefiniteness is not favored, particularly where the indefiniteness is removed by subsequent part performance, it is well recognized and has been repeatedly affirmed in the South Carolina decisions that the requirement of definiteness in the contract is more exacting where the remedy sought is specific performance of a contract than in an action for damages for breach of contract. White v. Felkel (1952) 222 S.C. 313, 322, 72 S.E. 2d 531; Yawkey v. Lowndes (1929) 150 S.C. 493, 514, 148 S.E. 554; Masonic Temple, Inc. v. Ebert (1942) 199 S.C. 5, 21, 18 S.E.2d 584; Anthony v. Eve (1918) 109 S.C. 255, 262–263, 95 S.E. 513; McMillan v. McMillan (1907) 77 S.C. 511, 514, 58 S.E. 431; Holley v. Anness (1894) 41 S.C. 349, 354, 19 S.E. 646; Davis v. McDuffie (1883) 18 S.C. 495, 501; Glazer v. Glazer (C.C.A. 5, 1967) 374 F.2d 390, 404, cert. denied, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90; Gulbenkian v. Gulbenkian (C.C.A. 2, 1945) 147 F.2d 173, 175, 158 A.L.R. 990. As the editor stated in 55 Am.Juris. p. 476: "The requirement of certainty is of special importance when specific performance of a contract for the sale of land is sought; a greater degree of certainty is required for the specific performance than is necessary to establish a contract as a basis for an action at law for damages."

■ In an action for specific performance or for damages, the contract, to be enforcible, must specify the manner and time of payment; absent such material provisions, the agreement falls for indefiniteness. Thus, in 68 A.L.R.2d 1222, the annotator summarizes the controlling principles in these words: "The terms governing the manner and time of payment of the price agreed upon have ordinarily been regarded as such an important part of the agreement that where the alleged contract expressly left these terms open for future negotiation the courts have usually held that the minds of the parties had never in fact met upon the essentials and a conveyance of the property would not be specifically enforced." Continuing, this same annotation adds that, "Provisions leaving the amount or time of payment of the down payment to future agreement have been held to render the agreement incomplete." (p. 1224)

Krum v. Chamberlain (1898) 57 Neb. 220, 77 N.W. 665, illustrates aptly the rule stated in 68 A.L.R.2d 1222. There the alleged contract for the sale of land on time rested, as does the plaintiff's claim here, on an exchange of letters between the parties. Such exchange made plain a sale at a fixed price and at an agreed rate of interest on the deferred balance but was silent on the down payment and on the maturity of the deferred balance. The Court held the correspondence failed to make out the essential and material terms of a contract sufficiently to support specific performance.

Morris v. Ballard (56 App.D.C. 383, 16 F.2d 175, 49 A.L.R. 1461) where specific performance of a somewhat indefinite contract on the terms of sale was ordered, does not depart from the general rule. There the Court based its conclusion on part performance, which, of course, remedies the infirmity of indefiniteness. Thus, the Court there concluded (p. 176): "The contract must be considered as a whole, and accordingly, since it had been partly performed by the plaintiff, the defendant was not entitled to refuse to perform his obligations under it." See, also, Ansorge v. Kane (1927) 244 N.Y. 395, 155 N.E. 683, 685, where Morris v. Ballard, *supra*, was distinguished with this statement:

"If the contract had been partly performed by the act of the purchaser in taking possession and making improvements, as in Morris v. Ballard [56 App.D.C. 383] (D.C.) 16 F.(2d) 175, 49 A.L.R. 1461, and Roberge v. Winne, supra, equity might grant relief, but that question is not presented."

4. Measured by these rules, the exchange of letters upon which the plaintiff relies does not appear to support a right in the plaintiff to specific performance. In the first place, it seems clear that neither party understood that the two letters of August 4 and August 6 were intended as or represented the final agreement of the parties. It must be recalled that, in his preliminary letter soliciting an offer from the defendant, the plaintiff stated that all he wanted to know was "the price per acre that you desire for the property, and then all the incidental matters can be worked out". The plaintiff thus was not seeking from the defendant a completed offer; securing a price, he wished to leave for future negotiation "all the incidental matters". And when he received the letter of August 4 from the defendant, he realized that the proposal set forth therein was incomplete and called for the preparation of a subsequent contract in which "all the incidental matters" could be developed. This was the reason for his persistent demand for a formal contract. He recognized, as his letter of September 2 so plainly stated, a subsequent contract was necessary so that, in his words, "everything will be legal and we can begin to check the title". Actually, it will be noted that the plaintiff had so little confidence in the exchange of letters—recognized that they were not "legal"—that he was unwilling to begin a title search. Nor is it conceivable that the plaintiff would have subsequently amended his offer to provide for the payment of $150 per acre for the delivery of a mere quitclaim deed, warranting only that it covered at least a 50% interest, if he had thought that the prior exchange of correspondence constituted a completed contract for the purchase at $150 per acre of a full fee simple title in the same property. It is true, the plaintiff professed his confidence in the exchange as a contract in

his letter of October 27, 1964, where he wrote that, if the contract was not forthcoming on or before November 6th, 1964, he would file suit for specific performance. But he did not file such suit. He continued with unabated persistence to seek a contract from the defendant, enlarging as he went along his offer. It was only months afterwards, when all hope of securing a contract disappeared, that this suit was filed. In the light of all these facts, it cannot be said that the parties intended, by the letters of August 4 and August 6, to establish, or understood that they were establishing, a completed agreement.

It seems equally clear that the letters of August 4 and 6 are lacking in that definiteness required for specific performance. Actually, the plaintiff recognized the obvious indefiniteness in defendant's letter of August 4 because in his reply he specifically pointed out that the defendant had not "set out the amount of down payment, if any". It should be added also, that neither letter indicated the terms on which the deferred balance of the purchase price was to be paid. The plaintiff did, in the contract he later submitted, which was rejected by the defendant,[8] provide for a down payment of 10% of the purchase price and for annual curtailments of the balance at the rate of 10% of the purchase price, thereby giving a maturity of nine years for the final payment on the purchase price. But the very definiteness of the later contract, as prepared by the plaintiff, emphasized the material omissions both of the down payment and of the maturity of the deferred balance in the two letters of August 4 and August 6. Because of these omissions, it cannot be said that such letters constituted a completed contract.

5. But defendant does not base her defense solely on this claim of indefiniteness. She argues that there is such inadequacy of price, the Court should refuse specific performance. The rule

8. See, Colleton Realty Co. v. Folk (1910) 85 S.C. 84, 86, 67 S.E. 156, where failure of a seller, in his reply, to answer a statement in a letter was held insufficient to constitute assent thereto, so as to conclude a contract.

as to inadequacy of price as a basis for a denial of specific performance was early stated in the leading case of Gasque v. Small (1848) 2 Strob.Eq. (21 S.C.Eq.) 72, 80, in these words:

> "The inadequacy must not be measured by grains, but it ought to be palpably disproportioned to the real and market value of the property, so as to constitute a hard, unreasonable, and unconscionable contract; but it is not necessary that it should be so gross as to excite an exclamation or to indicate imposition, oppression or fraud, for this would be sufficient ground not only for refusing a specific performance but for rescinding the contract."

In seeking to translate this general rule into a practical yardstick, the Court in that case noted (p. 80) that, in the civil law, the rule was "that the price must exceed half the value of the property purchased" and, after stating that such yardstick "has never been adopted in England or in this Country, concluded with the observation that "it may well be considered as a fair standard of inadequacy" that will support a denial of specific performance. See, also, Coley v. Coley (1913) 94 S.C. 383, 386–387, 77 S.E. 49; Hodge v. Shea (1969), S.C., 168 S.E.2d 82.[9]

In elaborating on the rule stated in the *Gasque Case,* the Court in Holly Hill Lumber Co., Inc. v. McCoy (1942) 201 S.C. 427, 442, 23 S.E.2d 372, said: "Where the inadequacy (of price) does not stand alone, but is accompanied by other inequitable incidents, the relief (against specific performance) is much more readily granted." Then, in defining "other inequitable incidents", the Court proceeded:

> "When the accompanying incidents are inequitable and show bad faith,

such as concealment, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, *weakness of mind,* sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other,—these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative." (Italics added)

See, also, 65 A.L.R. 94, et seq.

6. In this case the price is clearly inadequate. As I have already found, the value of the property in August, 1964, was three times the amount stated in defendant's letter of August 4. The plaintiff's persistent pursuit of his bargain indicates that he recognized that the real value of the property was substantially greater than $150 per acre. The plaintiff was a lawyer of ability, with great knowledge of real estate values in the Lincolnville area based on extensive experience in that field, and in the full possession of his faculties. The defendant, on the other hand, was advanced in years, living remote from the property involved, with access to no reliable information on value in the Lincolnville neighborhood, without any knowledgeable adviser so far as the record shows, and but shortly released from a mental institution, after some six or eight years of confinement. Both her letters and subsequently her demeanor as a witness on trial show a certain mental confusion on her part. Her very vacillation, as reflected in her letters, confirm such conclusion. Even assuming that inadequacy of consideration, however great, may not of itself warrant a denial of specific performance, certainly, as the Court remarked in the *Holly Hill Lumber Co. Case, supra,* when

9. In the excellent opinion in Bradley v. Heyward (C.C.S.C.1908) 164 F. 107, aff. 4 Cir., 179 F. 325, the Court in a painstaking opinion of Judge Brawley, concluded that mere inadequacy of price was no ground for denial of specific performance. It must be noted, however, that as the Court emphasized, the contract in that case "was not made in haste, but after full opportunity for deliberation, by educated men, of more than ordinary intelligence, having the use of their eyes, their minds on the alert, and their interest awakened, and means of knowledge being open to both." (p. 112)

that gross inadequacy is "combined" with "weakness of mind" on the part of the seller, a denial is warranted. (201 S.C. p. 442, 23 S.E.2d 372) That indisputably is the situation here.

7. Considering the indefiniteness of the correspondence on which plaintiff bases his right of action, the plain intention of the parties that material provisions of the contract were afterwards to be agreed upon as evidenced by such correspondence, as well as the gross inadequacy of the purchase price coupled with the defendant's "weakness of mind", I conclude that the plaintiff is not entitled to the relief of specific performance and that judgment should be for the defendant,

And it is so ordered.

