BLANTON ENTERPRISES,
INC., Plaintiff,

v.

BURGER KING CORPORATION, William Prather, Woodlo, Inc. and Walter Haywood Fox, Jr., Defendants.

Civ. A. No. 0:87–50–15.

United States District Court,
D. South Carolina,
Rock Hill Division.

Feb. 26, 1988.

James W. Sheedy, Spencer & Spencer, Rock Hill, S.C., for plaintiff.

John L. Choate, Arthur L. Coleman, Monteith P. Todd, Nelson, Mullins, Riley & Scarborough, Columbia, S.C., and Robert J.

Bagdasarien, Kevin F. Kostyn, Breed, Abbott & Morgan, New York City, for Burger King Corp. and William Prather.

M. Craig Garner, Jr., McNair Law Firm, Columbia, S.C., and William L. Rikard, Jr., Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N.C., for Woodlo, Inc. and Walter Haywood Fox, Jr.

## ORDER

HAMILTON, District Judge.

This matter is before the court upon the defendants' motions for summary judgment on all counts of the complaint. Rule 56, Fed.R.Civ.Proc. After an exhaustive review of the record in this case and the briefs of counsel, the court conducted a detailed hearing on the matter on February 4, 1988. Based upon this review, the court finds that there are no genuine issues of material fact and all defendants are entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.Proc.

The court has jurisdiction in that the parties are of diverse citizenship, 28 U.S.C. § 1332. In addition, the court has federal question jurisdiction, 28 U.S.C. § 1331, based upon plaintiff's federal antitrust allegations, 15 U.S.C. § 1.

### Background Facts

Plaintiff is Blanton Enterprises, Inc. of Rock Hill, South Carolina, whose relevant principals are Wiley Blanton (president and 75% stockholder) and Carl Grimm (executive vice president and 15% stockholder). Defendants are Burger King Corporation of Miami, Florida (hereinafter "BKC"), William Prather (executive vice president of BKC)[1], Woodlo, Inc. of Charlotte, North Carolina, whose relevant principals are Walter Haywood Fox, Jr. (president, owner, and also a defendant in this action), and Richard Elliott (executive vice president).

Since 1978, plaintiff has been a successful franchisee of Burger King restaurants and currently owns six franchises in North and South Carolina. As early as 1982, plaintiff allegedly first considered the possibility of building a Burger King restaurant in the Fort Mill, South Carolina area, near the Carowinds amusement park. In September of 1985, plaintiff filed an application for a proposed franchise in close proximity to Carowinds, which is located just off the Interstate 77 exit in South Carolina. The Carowinds location was less than two miles and just minutes away from Woodlo's Burger King restaurant on Westinghouse Boulevard, which was built in 1982. Fox operates this and a number of other Burger King restaurants in the Charlotte area. The Westinghouse restaurant is positioned near an exit of Interstate 77 outside the City of Charlotte. In constructing the Westinghouse location, Fox had anticipated that some of its customers would include people visiting Carowinds. *See* BKC exhibit 4.

Upon hearing of plaintiff's intention, Fox complained to Robert Gumm, regional vice president in charge of BKC's Atlanta region (which includes Charlotte), and Tony Whitfield, an area franchise manager of BKC, that the proposed Carowinds site would cannibalize or take business from his Westinghouse location. Fox presented BKC's regional personnel with data supporting his belief that plaintiff's Carowinds site would cannibalize 25% of his business. *See* BKC exhibit 2. BKC's regional personnel favored plaintiff's new site and believed that its cannibalization of Westinghouse would be no more than 10%. Fox then took his case to Tony Rolland, executive vice president of BKC's southern division. *See* BKC exhibit 3. Rolland, who had been with BKC for over fifteen years and had extensive experience in conducting cannibalization studies, flew from Miami to Charlotte on February 14, 1986, to resolve the cannibalization dispute.[2]

---

1. Although several of the parties to this action now occupy different positions of employment, the court references only the positions they held at times relevant to this action.

2. As early as December 15, 1985, and no later than December 23, 1985, plaintiff knew that Rolland would be making a final decision regarding the cannibalization issue around the first of the year. *See* plaintiff's answer III to court interrogatories; BKC's exhibit 22.

In the company of Gumm, Whitfield, and Ken Allgood (a BKC real estate representative), Rolland allegedly spent the better part of February 14 touring the area around the Carowinds and Westinghouse locations, including Interstate 77 and local roads connecting the two sites. Rolland allegedly observed, *inter alia*, traffic flow, highway access, and residential, commercial, and industrial development in the area of the two sites. In addition, Rolland allegedly had access to BKC's regional file on the Carowinds site, which included maps and demographic data of the area.

When Rolland's tour reached Westinghouse, he met Fox for the first time. Defendants allege that Rolland, Gumm, and Whitfield had a cup of coffee with Fox at a table in the middle of the restaurant, but at no time were Rolland and Fox alone. They contend that the brief conversation was casual and defendants covered, among other things, the cannibalization issue.

Rolland subsequently decided that the regional employees' cannibalization estimate was too low, and that plaintiff's proposed Carowinds site would cannibalize Fox's Westinghouse location by 20% to 25%. In Rolland's view, this percentage of cannibalization would not be in BKC's best interests because it would result in a weakening of both franchise sites. BKC's executive vice president, William Prather, concurred in Rolland's opinion and notified plaintiff of BKC's decision not to locate a franchise at the Carowinds site. This action followed.

In its first and second causes of action, plaintiff seeks, against all defendants, millions of dollars in treble damages for a conspiracy under section 1 of the Sherman Act, 15 U.S.C. § 1, and under the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39–5–20(a) (Law.Co-op.1976).[3] The thrust of plaintiff's complaint is that BKC and Prather conspired with defendants Woodlo and Fox to deny plaintiff a franchise at the Carowinds site. Plaintiff disputes BKC's decision that a franchise at Carowinds would significantly cannibalize Woodlo's nearby Westinghouse restaurant.

Plaintiff claims that the "real reason" for denial of the franchise was "concealed." Plaintiff, however, does not specify what the real reason was, but only offers its "suspicion" that the reason "may have been articulated by Tony Rolland ... and defendant Fox in a closed-door meeting in February 1986." Complaint at ¶¶ 28, 33–34; plaintiff's answer 7 to BKC's interrogatories.

Plaintiff also alleges that this conspiracy between the defendants led BKC to wrongfully terminate a franchise which it had orally granted plaintiff at the Carowinds site. Plaintiff concedes that, with respect to the Carowinds site, it never received the written approvals required by BKC's official franchising procedures. *See infra* discussion at pp. 769–70. BKC's official franchising procedures also required the parties to execute a preliminary agreement as well as a final franchise agreement, which they never did. Plaintiff contends, however, that certain BKC regional employees granted it oral approvals and orally awarded it the Carowinds site franchise. In its wrongful termination claim against BKC, plaintiff seeks $4,727.00 in incidental damages and lost profits for the term of the franchise, which was for twenty years.

Plaintiff's remaining claim against BKC is based on the doctrine of promissory estoppel. Plaintiff alleges that in reasonable reliance on BKC's oral promises and representations, it suffered the identical injury claimed in its wrongful termination cause of action.

In its last cause of action, directed only to defendants Woodlo and Fox, plaintiff contends that these two defendants tortiously interfered with its franchise agreement for the Carowinds site. Plaintiff seeks the same damages it claims above in its wrongful termination and promissory estoppel causes of action.

### Antitrust, 15 U.S.C. § 1

 15 U.S.C. § 1 provides in pertinent part that "every contract, combination in the form of a trust or otherwise, or conspir-

---

**3.** Plaintiff also seeks punitive damages in its federal antitrust claim.

acy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." This statute is not to be construed literally, rather, only those practices which unreasonably restrain competition are proscribed. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

A violation of § 1 is not proved by a mere refusal to deal because a manufacturer has the right to deal or refuse to deal with a particular distributor as long as it does so unilaterally. *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Consequently, before a plaintiff can prevail on a § 1 claim he must, as an element of his case, produce evidence of concerted action. *Monsanto v. Spray Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Both the Supreme Court and the Fourth Circuit Court of Appeals have recently spoken on the requisite elements of a plaintiff's § 1 case. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Monsanto, supra; Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905 (4th Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3394 (U.S. Nov. 17, 1986) (No. 86–794); *Terry's Floor Fashions v. Burlington Industries*, 763 F.2d 604 (4th Cir.1985).

In *Terry's*, the Fourth Circuit summarized the plaintiff's burden in a § 1 case. The court stated:

> In *addition* to establishing a conspiracy, a successful plaintiff must also show: (1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects of and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy.

*Terry's*, 763 F.2d at 610 n. 10 (emphasis added, citations omitted).

While this burden has not changed markedly in recent years, the nature of the proof and range of permissible inferences regarding the existence of a conspiracy has undergone significant change since the Fourth Circuit ruling in *Bostick Oil Co., Inc. v. Michelin Tire Co.*, 702 F.2d 1207 (4th Cir.1983), *cert. denied*, 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983). *Bostick* allowed an inference of conspiracy to be drawn when the manufacturer, in response to dealer complaints about plaintiff's sales practices, terminated the plaintiff's dealership. *Bostick*, 702 F.2d at 1213–15. As discussed *infra*, "evidence of a distributor's termination by a manufacturer following, or *even in response to,* complaints by other distributors is not sufficient evidence from which to infer a conspiracy." *Terry's*, 763 F.2d at 615 (citing *Monsanto Co. v. Spray Rite Service Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)) (emphasis added).

### Conspiracy

Proof of a conspiracy by direct evidence is seldom, if ever, possible. Consequently, "direct proof of an expressed agreement is not required" and the plaintiff may rely on inferences drawn from circumstantial evidence. *Terry's*, 763 F.2d at 611 (quoting *Edward J. Sweeny & Sons, Inc. v. Texaco*, 637 F.2d 105, 111 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). However, there is a distinction to be drawn between reasonable inferences and mere speculation. "Plaintiff's conclusion or speculation as to the existence of a conspiracy, *without more*, is not sufficient to establish a section 1 violation." *Terry's*, 763 F.2d at 611 (quoting *Terry's Floor Fashions v. Burlington Industries*, 568 F.Supp. 205, 210 (E.D.N.C. 1983)) (emphasis added). When the moving party in a summary judgment motion meets its burden under Rule 56(c) by showing the absence of any genuine issue of material fact then the nonmoving party "must do *more* than show there is some metaphysical doubt as to the material facts." *Matsushita*, 106 S.Ct. at 1356 (emphasis added).

While the Supreme Court has not unambiguously defined what more the nonmovant must adduce in terms of proof, it has clearly required that "to survive a motion

for summary judgment ... a plaintiff seeking damages for a violation of section 1 must present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.'" *Matsushita*, 106 S.Ct. at 1357 (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471). In *Matsushita*, the Supreme Court cautioned against allowing fact finders to infer conspiracies when such inferences are implausible. *Matsushita*, 106 S.Ct. at 1356. The court, when discussing the relationship between the plausibility of a motive to conspire and the creation of a genuine issue of material fact, stated:

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Matsushita*, 106 S.Ct. at 1361 (citations omitted); *see also Terry's*, 763 F.2d at 611–612; *Kreuzer v. American Academy of Periodonotology*, 735 F.2d 1479 (D.C.Cir.1984).[4]

The plaintiff in a dealer termination case has also seen a shift in the scope of permissible inferences which may be drawn by a defendant dealer's complaints to the manufacturer. In *Terry's Floor Fashions v. Burlington Industries*, 763 F.2d 604 (4th Cir.1985), the court held that "evidence of a distributor's termination by a manufacturer following, or even in response to, complaints by other distributors is not sufficient evidence from which to infer a conspiracy." *Id.* at 615 (citing *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470.). As Chief Judge Winter made clear in his concurrence, the rationale for this holding is:

> A manufacturer would otherwise face the threat of treble damages solely because it acted on the information originating as a distributor complaint. The danger of liability based on such 'highly ambiguous evidence' would deter lawful unilateral conduct and the optimal use of market information, thereby creating 'an irrational dislocation in the market.' (citations omitted).

*Terry's*, 763 F.2d at 615–16 (Winter, C.J. concurring).

Additionally, in *Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905, 909 (4th Cir.1986), the court held that even if the complaints by the competing distributor rise to the level of threats, economic

---

**4.** In *Kreuzer,* the District of Columbia Court of Appeals stated:

> This court has had little opportunity to explore the parameters of the Supreme Court's decisions in this area. Two cases do discuss the issue in part. In *Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 663 F.2d 253 (D.C.Cir.1981), *cert. denied* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982), this court stated that an inference of conspiracy may be drawn 'when the alleged co-conspirators have acted in a way inconsistent with independent pursuit of economic self interest [and] that inference is warranted only when a theory of rational, independent action is less attractive than that of concerted action.' *Id.* at 267. Likewise, in *Proctor v. State Farm Mutual Auto Insurance Company,* 675 F.2d 308 (D.C.Cir.1982), *cert. denied,* 459 U.S. 839 [103 S.Ct. 86, 74 L.Ed.2d 81] (1982), this court held that a conspiracy should only be inferred when the conduct in question is inconsistent with that to be expected from each party individually pursuing his own interests. *Id.* at 327.

> 'Based on the following, we can draw the following conclusions applicable to our analysis of this case. A plaintiff may establish a conspiracy under section 1 of the Sherman Act by circumstantial evidence, such as inferences drawn from the behavior of the alleged co-conspirators. Such an inference may only be drawn, however, when an alleged conspirator has acted contrary to his own independent interests. Thus, parallel behavior *alone* is insufficient evidence from which to infer a conspiracy.'

> *Kreuzer,* 735 F.2d at 1487–88 (footnotes omitted; emphasis in original).

> While *Kreuzer* is not binding authority in this circuit, it is nevertheless persuasive evidence of the shift of the courts toward disallowing the inference of a conspiracy in the absence of a reasonably plausible economic motive to conspire. To the extent *Kreuzer* may impose a more stringent burden than *Matsushita* or *Monsanto* in allowing a conspiracy to be inferred, it has not been relied upon by this court.

duress or coercion, or are mere expressions of dismay, the terminated distributor must still present additional evidence that the manufacturer and another distributor acted in concert. There needs to be "evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471 (citations omitted).

 Briefly stated, a conspiracy will not be inferred merely because a manufacturer responds to a dealer's complaints. *Monsanto, supra; Garment District, supra; Terry's, supra.* Such a rule could paralyze perfectly legitimate conduct. *Id.* Therefore, assuming the moving party (defendant) has shown the absence of a genuine issue of material fact, plaintiff must put forward additional evidence tending to exclude the possibility that the manufacturer and nonterminated distributor(s) were acting independently. *Monsanto, supra.* The lack of a plausible motive to conspire is highly relevant to whether a genuine issue for trial exists within the meaning of Rule 56(e). When the alleged conspirators had "no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita*, 106 S.Ct. at 1361 (citations omitted).

While it is unclear as to the exact theory of conspiracy plaintiff relies upon, the gist of his complaint and brief is directed to the allegation that Fox and Woodlo had and exercised the authority to veto plaintiff's establishment of a Burger King restaurant at the Carowinds site. *See* complaint at ¶¶ 37 and 43. BKC and all the other defendants have consistently denied any such veto authority and state that the franchise was denied solely because the Carowinds site would cannibalize the Westinghouse Boulevard site operated by Woodlo. Prather, 148; Rolland, 195–96; Gumm, 176, 195; Whitfield, 151–52; Allgood, 193; Fox, 156; Hilliard, 135–36.

 Plaintiff's mere assertion of a conspiracy or even unrebutted proof that his franchise was disallowed because of Woodlo's complaint does not, without more, constitute sufficient evidence to withstand a motion for summary judgment. *Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905, 909 (4th Cir.1986). (A conspiracy will not lie merely because a manufacturer responds to another dealer's complaints.) As had been noted, to withstand a motion for summary judgment when the moving party has met his burden under Rule 56(c), the nonmovant must produce evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Matsushita*, 106 S.Ct. at 1357. The plausibility of a motive to conspire is highly relevant to whether a genuine issue exists for trial. *Id.*, at 1361. "[I]f the [alleged conspirators] had no rational economic motive to conspire, and if their conduct is consistent with other equally plausible explanations, the conduct does *not* give rise to an inference of conspiracy." *Id.* (citations omitted; emphasis added).

Plaintiff in this case has no direct evidence of a conspiracy. Blanton, 168–69, 189; Grimm, 194–95. Rather, it attempts to convert the February 14, 1986, meeting between Rolland, Fox, Gumm, and Allgood into a closed-door secret meeting between Fox and Rolland wherein a conspiracy was hatched. *See* plaintiff's answer to BKC's interrogatory 7; Rolland, 153–56, 161, 209–12; Gumm, 155–58, 187–88, 195; Allgood, 146–47, 190–94; Whitfield, 114–17, 148–49, 151–52, 154; Fox, 142–43, 151–66. Plaintiff characterizes its claim of conspiracy as its "suspicion." *See* complaint at ¶¶ 28–34; plaintiff's answer to BKC's interrogatory 7.

 After a complete review of the record in this case and after hearing the arguments of counsel on this matter, the court finds that the defendants have met their burden of showing the absence of any genuine issue of material fact and that they are entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.Proc. Also based upon the above review, the court finds that the plaintiff has presented no evidence which viewed in the light most favorable to it raises a genuine issue of

material fact as to the § 1 claim. Rule 56(e), Fed.R.Civ.Proc.

A substantial portion of the plaintiff's brief was spent in criticizing the manner in which Rolland's cannibalization study was conducted as well as the results obtained. *See* plaintiff's brief in opposition to defendants' motion for summary judgment (hereinafter plaintiff's brief) at pp. 23–26. Yet, it points to no evidence to refute the reasons given for the denial of the Carowinds franchise by BKC. Additionally, it points out no plausible reason why BKC would deny the franchise to plaintiff other than the reasons asserted by BKC. It does suggest that BKC denied the franchise in fear of a lawsuit by Fox. *See* plaintiff's brief at p. 25. But, as *Garment District* makes clear, the mere fact that the manufacturer responds to dealers' complaints, even if they rise to the level of threats, does not, without more, allow the inference of a conspiracy. 799 F.2d at 909. Also, the implausibility of a conspiracy in this case militates against the finding of a conspiracy. *Matsushita*, 106 S.Ct. at 1361. Neither of plaintiff's principals could offer any plausible economic motive for BKC's denial of the Carowinds site franchise. Grimm, 189; Blanton, 253. Plaintiff's theory of conspiracy is especially implausible when one realizes that BKC was pushing defendants Fox and Woodlo extremely hard to develop Burger King franchises *within* the City of Charlotte. See exchange reflected in BKC exhibits 10–16. Plaintiff, on the other hand, had experienced no development deficiencies with BKC. Plaintiff's theory of conspiracy also strains plausibility when the facts reveal that BKC's regional representatives were backing Blanton in his efforts to build a Burger King restaurant at the Carowinds site. Gumm, 140, 178–81. Also, both of plaintiff's principals, Blanton and Grimm, readily admit that site selection, of which cannibalization analysis is a component part, is a subjective judgment subject to reasonable differences of opinion. Blanton, 170–72; Grimm, 67–69.

Additionally, Rolland's evaluation that cannibalization at Westinghouse would be approximately 20% to 25% if a franchise were awarded to plaintiff at Carowinds was based, in substantial part, upon the sparse residential population near the Westinghouse site, Westinghouse's reliance upon travellers, particularly those on Interstate 77, and the close proximity of the proposed Carowinds site to the existing Westinghouse site. Rolland, 152–53, 159–64, 189. *See also* Gumm, 181–82. It is worthy to note that the factors upon which Rolland based his evaluation were the same factors which BKC noted in its initial consideration of Woodlo's application in 1981 for a Burger King franchise at the Westinghouse Boulevard site. *See* BKC exhibit 4. While these facts, in and of themselves, do not conclusively refute the existence of a conspiracy, they do tend to show that BKC was acting independently when it denied the franchise at the Carowinds site.

Apparently realizing the paucity of evidence of a conspiracy, plaintiff offers the alleged veto rights of Woodlo and Fox as either evidence of the conspiracy or as evidence of an unspecified horizontal per-se violation of § 1. The facts are not capable of any such construction regarding the Carowinds site. Before beginning discussion, it is relevant to quote Blanton's deposition: "Burger King does not have territorial agreements and I'll be the first to tell you that." Blanton, 229.

While Fox has asserted some territorial rights regarding Burger King franchises in the City of Charlotte, he has never argued that such rights extend beyond the city limits. *See* BKC exhibits 10–16.[5] Particularly relevant are BKC exhibits 11 and 17. In BKC exhibit 11, Fox asserts that "exclusive opportunities" were given to him to develop within the City of Charlotte. He bases these rights to a marked, if not exclusive, degree upon a plan put forth by Dennis Siefkes (franchise area manager for the Atlanta region in 1982). In BKC exhib-

---

**5.** Plaintiff's counsel admitted at oral argument that Fox never represented that his exclusive territorial rights extended beyond the city limits of Charlotte. The Carowinds site is located in an area around Fort Mill, South Carolina. This area is not within the city limits of Charlotte, North Carolina.

it 17, Siefkes proposed that "Woody Fox *and* Nasif Majeed would develop within the city limits of Charlotte; Wiley Blanton [plaintiff] and his organization would develop the south and southeast sections of Mecklenberg County and the surrounding areas." (emphasis added). It is worthy to note that BKC exhibit 17 is the same authority that plaintiff relies upon when he asserts that the Carowinds site was his territory to develop. Blanton, 203–05. Even Wiley Blanton admits that it was his understanding that only the city proper of Charlotte was Fox's territory. *Id.* Consequently, any exclusive right which may have existed, and which BKC vigorously denied, did not encompass the disputed area. This further adds to the implausibility of plaintiff's theory of conspiracy based upon some alleged veto rights of Woodlo and Fox. Finally, plaintiff tries to insinuate that Fox had an exclusive territory which encompassed the area around Carowinds. *See* plaintiff's brief at p. 44; Fox, 34. However, a reading of Fox's deposition at pages 34 and 35 makes clear that any such inference is pure speculation. Fox's testimony at those pages merely supports the argument that he was well justified in his complaint to Rolland and that Rolland was not conspiring when he denied the franchise application for the Carowinds site. Therefore, the lack of any exclusive territory owned by Woodlo and Fox which could encompass the Carowinds area further militates in favor of the grant of summary judgment due to the absence of a conspiracy. The conspiracy suggested by plaintiff is, on the facts of this case and construed most favorably toward plaintiff, patently implausible. *Matsushita, supra.*[6]

In summation, and in light of the previously cited authorities, this court finds that the defendants have met their burden under Rule 56(c) by pointing out to the court the absence of any genuine issue of material fact. The materials submitted in conjunction with the defendants' motion for summary judgment clearly indicated that the defendant BKC acted independently in denying plaintiff's Carowinds franchise application. Defendants directed the court to the evidence that indicates the sole reason for denial of the Carowinds franchise was the unacceptable level of cannibalization which would occur at the Westinghouse Boulevard store. Plaintiff has failed to create a genuine issue of fact regarding an alleged conspiracy. It has admitted that any exclusive territory which defendants Woodlo and Fox may have owned did not encompass the Carowinds site, and its suggested theory, i.e., a trade-off of the Carowinds site for increased development within the city limits of Charlotte, lacks any economic plausibility. For the court to find a conspiracy under these facts would be a transgression into the realm of metaphysical speculation rather than remaining within the prescribed realm of reasonable inference. *Monsanto, supra.*[7]

---

**6.** Although it was not even hinted in plaintiff's brief, at oral argument plaintiff suggested an alternative theory of conspiracy. Plaintiff suggested that BKC denied the Carowinds site in response to Fox's complaint upon the agreement that Fox would make a conscientious effort to develop within the Charlotte city limits. In effect, plaintiff asserts that BKC agreed to give up the "bird in the hand" for the "birds in the bush." Given that Woodlo was experiencing, in BKC's view, significant developmental deficiencies and that plaintiff had never experienced any such deficiencies, this theory is blatantly implausible. Any leverage obtained by BKC pursuant to such an agreement would immediately disappear upon the denial of the Carowinds site franchise.

**7.** Plaintiff, in apparent disregard of *Monsanto* and *Matsushita,* proposes a novel theory of proof premised upon the cases of *Fragale &* *Sons Beverage Co. v. Dill,* 760 F.2d 469 (3rd Cir.1985) and *Tunis Brothers v. Ford Motor Co.,* 763 F.2d 1482 (3rd Cir.1985). *See also* plaintiff's brief at pp. 39–41. In gist, plaintiff proposes as a theory of proof that it need only put forth a *prima facie* case of conspiracy, then the burden would shift to the defendants to introduce evidence of independent actions. Once the defendants have introduced evidence of independent action, the burden would then shift back to the plaintiff to exclude the possibility of independent action. The court notes initially that *Tunis Brothers* was vacated and remanded by the Supreme Court and is of no precedential value. *Ford Motor Co. v. Tunis Brothers Co., Inc.,* 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986). On remand, the Third Circuit did not adopt the standard of proof as suggested by plaintiff. Rather, it held that "given this situation, in which the appellees' challenged conduct is as consistent with permissible competition as

## Anticompetitive Effect

As has been noted, one of the elements in a plaintiff's § 1 case is the requirement that the plaintiff show "the

it is with illegal conspiracy, *Matsushita* teaches that it is appellants' [plaintiff's] burden at the summary judgment stage to produce evidence that tends to exclude the possibility that Ford acted independently and thus to show that an inference of illegal conspiracy is reasonable in light of the competing inference of independent action." *Tunis Brothers*, 823 F.2d at 50–51. *Fragale & Sons*, a pre-*Matsushita* case, also did not adopt plaintiff's proposed standard of proof. Fragale applied the standard of proof dictated by the Supreme Court in *Monsanto Co. v. Spray Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984): "[T]he court held that an antitrust plaintiff must establish, either by direct or circumstantial evidence, that the defendants 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' As part of this burden, the antitrust plaintiff must produce evidence that 'tends to exclude the possibility that the [defendants] were acting independently'." *Fragale*, 760 F.2d at 473 (citing *Monsanto*, 465 U.S. at 769, 104 S.Ct. at 1473.) (citations omitted). In view of these holdings, plaintiff's proposed theory of proof must be rejected.

Assuming *arguendo* that plaintiff is correct regarding the standard of proof in a § 1 summary judgment matter, the court would find, for the reasons cited in the body of this order, that the defendants have met the required burden of proof and that the plaintiff has failed to meet his burden. Plaintiff has also suggested that the cases of *Fragale* and *Tunis Brothers* support his argument that a conspiracy may be found under the facts of this case. The court does not agree because both cases are clearly factually distinguishable. In *Tunis Brothers*, the plaintiff produced "substantial" evidence tending to exclude the possibility of independent action. *Tunis Brothers*, 823 F.2d at 51. Tunis Brothers produced evidence from which it could be inferred that Ford, acting in conjunction with another defendant, "engaged" in trickery and chicanery in order to eliminate Tunis as a "competitor" of another defendant. They also produced evidence showing that defendant Ford "had a substantial financial interest" in another defendant's Ford dealership. *Id.* Tunis Brothers also produced evidence that "two Ford [defendant] employees, appellees [defendants] Fraher and Hasel, served as directors and officers of [defendant] Werner Ford." *Id.* In addition, Tunis Brothers produced evidence "from which one may conclude that Ford [defendant] employees tricked Tunis [plaintiff] into resigning and caused" a potential purchaser of plaintiff's dealership "to be rejected due to false financial information that [defendant] Fraher had inserted into their dealership application." *Id.* The quantity, scope, and strength of the

conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market." *Terry's*, 763 F.2d at 610 n. 10.[8] Vertical restraints are "combi-

evidence in *Tunis Brothers* radiates in comparison to the evidence offered by plaintiff in this case.

In the case of *Fragale & Sons*, plaintiff produced substantial evidence from which a motive to conspire on the part of the defendants could reasonably be inferred. *Fragale*, 760 F.2d at 474. *Fragale* produced evidence that a previous competitor of one of the defendants had engaged in price competition with the defendant and that none of the defendants welcomed such competition or the prospect that plaintiff Fragale would engage in like competition. Additionally, *Fragale* produced significant evidence challenging each of a defendant's articulated reasons for refusing to deal with the plaintiff. *Id.* In this case, plaintiff has shown no prior price competition between the parties nor has he rebutted, other than by speculation, the reasons asserted by defendants as to their motive for complaining about the proposed Carowinds restaurant and for its ultimate rejection by BKC. Plaintiff offers only the hope that he may be able to prove at trial that cannibalization at the proposed Burger King site would be less than that asserted by Rolland. Such speculation is not a reasonable inference within the meaning of Rule 56.

8. Plaintiff, assuming its evidence raises a reasonable inference of conspiracy, which it does not, argues that it need not put into evidence matters by which a reasonable inference of anticompetitive effect can be shown because the asserted antitrust violations are horizontal in nature and *per-se* illegal. Plaintiff has asserted that the conduct in question may constitute either a group boycott/concerted refusal to deal, a horizontal territorial allocation, or an exclusive dealing arrangement. A group boycott is a concerted action with a purpose either to exclude a person or group from the market or to accomplish some other anticompetitive object or both. *Klor's v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In *Klor's*, the Supreme Court specifically noted that its discussion of group boycotts in the context of that case should be distinguished from "a case of a single trader refusing to deal with another, [or a case of] a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in [*Klor's*] complaint is a *wide combination consisting of manufacturers, distributors, and a retailer.*" *Id.* at 212–13, 79 S.Ct. at 709–10 (footnote omitted; emphasis added). The facts of this case clearly do not give rise to a group boycott as that term has been defined in the leading case of *Klor's*. Regarding the asserted horizontal territorial allocation, this situation arises when competitors at the same level of

nations of persons at different levels of the market structure, such as manufacturers and distributors." *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2nd Cir.1978), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979); *see also United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Chuck's Feed & Seed v. Ralston Purina Company,* 810 F.2d 1289, 1294 (4th Cir. 1987). According to *Oreck:*

> [W]hile vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. [36] at 54, 97 S.Ct. 2549 [at 2559]. They are therefore to be examined under the rule of reason standard.

579 F.2d at 131.

The traditional relationship between a franchisor and franchisee is a classic vertical relationship. *Philadelphia Fast Food, Inc. v. Popeye's Famous Fried Chicken,* 647 F.Supp. 216 (E.D.Pa.1986) (see numerous appellate court cases cited therein). With very rare exceptions, vertical restraints are to be judged by violations of the Sherman Act under the rule of reason. *Continental,* 433 U.S. at 57–59, 97 S.Ct. at 2561–2562.

The most commonly cited statement of the rule of reason is that articulated by Justice Brandeis in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or may destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was opposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

While departures from the rule of reason in a vertical restraint analysis may be acceptable in unique situations, the Supreme Court has clearly held that any departure must be "based upon demonstrable economic effect rather than ... upon formalistic line drawing." *Continental,* 433 U.S. at 58–59, 97 S.Ct. at 2562.[9] When testing a vertical nonprice restraint under the rule of reason, "the plaintiff must prove the restraint had an anticompetitive effect in the relevant [product and geographic] market in order to prevail." *Muenster Butane,*

---

distribution decide to divide up the territories. It is *per-se* illegal. *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The horizontal market allocation must be contrasted to the situation where territorial allocations regarding distributors are established by the supplier or manufacturer. These nonprice vertical restraints are judged under the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). It must be noted that BKC is not a horizontal competitor of the plaintiff; its nearest company owned restaurant is located in Greensboro, North Carolina, a distance of over 100 miles from the Carowinds site. Additionally, for the reasons stated *supra,* defendants Woodlo and Fox had, as plaintiff admitted at the February 4, 1988, hearing on this matter, no right to allocate territories at or near the

Carowinds site. Consequently, for the reasons stated, a theory of a horizontal territorial allocation is untenable. Finally, and assuming that BKC imposed some sort of an exclusive dealing arrangement upon its franchisees, such a restraint would not be *per-se* illegal, but rather would be judged under the rule of reason. *Continental; Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.,* 810 F.2d 1289 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 94, 98 L.Ed. 2d 55 (1987). Therefore, as the alleged violations asserted by plaintiffs cannot constitute a horizontal, and therefore *per-se* illegal restraint, they must be analyzed under the rule of reason.

**9.** For the reasons discussed *infra,* plaintiff is unable to show any demonstrable economic effect.

*Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir.1981) (citing *Continental*, 433 U.S. at 58–59, 97 S.Ct. at 2562.) [10] The Supreme Court went to great lengths to explain the rationale for holding that, as a general rule, vertical restraints should be examined under the rule of reason versus being deemed *per-se* illegal.[11] The *Continental* opinion noted that while intrabrand competition may be reduced by such restraints, interbrand competition will often be benefited. *Id.* at 51–52 n. 19, 97 S.Ct. at 2558 n. 19. Additionally, strict invocation and adherence to *per-se* rules would produce an unintended and undesirable rigidity in the law. *Id.* at 50 n. 16, 97 S.Ct. at 2557 n. 16.

As has been discussed, a plaintiff in a vertical nonprice restraint case must show that the restraint had an adverse anticompetitive effect in the relevant geographic and product markets. *Continental, supra; Terry's Floor Fashions, supra; Muenster Butane, Inc., supra; Philadelphia Fast Foods, supra.* Obviously, "An antitrust policy divorced from market considerations would lack any objective benchmarks." *Continental*, 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21. Additionally, the court notes that interbrand competition is the primary concern of antitrust laws. *Id.* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. This is the case because the presence of interbrand competition "provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Id.* Consequently, the market power of the alleged conspirators and the extent of interbrand competition are significant factors in determining if a nonprice vertical

restraint produces an anticompetitive effect.

Definition of the relevant product market involves identification of all of the substitutes available to buyers of the seller's product. In identifying these products, the Supreme Court has emphasized that courts must determine what products have 'reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered.' *United States v. E.I. duPont de Nemours & Company* [1956 Trade Cases ¶ 68,369], 351 U.S. 377, 404 [76 S.Ct. 994, 1011, 100 L.Ed. 1264] (1956). Thus, factors such [as] 'industry or public recognition of the submarket as a separate economic entity, the products particular characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors' should be considered in determining interchangeability. *Brown Shoe Company v. United States,* [1962 Trade Cases ¶ 70,366], 370 U.S. 294, 325 [82 S.Ct. 1502, 1524, 8 L.Ed.2d 510] (1952).

*Philadelphia Fast Foods,* 647 F.Supp. at 227.

The relevant geographic market, while usually a debated issue, is characterized as "the area in which a potential buyer may rationally look for the goods or services he seeks...." *Philadelphia Fast Foods,* 647 F.Supp. at 229 (quoting *Pennsylvania Dental Association v. Medical Services Association of Pennsylvania,* 745 F.2d 248, 260 (3rd Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). Plaintiff must produce some evidence of these markets besides his mere speculative assertions. *Chuck's Feed &*

---

10. The Fourth Circuit has had several recent opportunities to discuss the proper characterization of manufacturer-dealer relationships as they relate to § 1 claims. In each case, the relationship was characterized as vertical. See *Chuck's Feed & Seed Co. v. Ralston Purina C.,* 810 F.2d 1289, 1293, *cert. denied,* —— U.S. ——, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987) (exclusive dealing arrangement analyzed under rule of reason); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 n. 10 (4th Cir.1985) (Dealer termination in response to another dealer's complaints analyzed under rule of

reason. The restraints were classified as nonprice vertical restraints.) The Second Circuit has also ruled that "efforts by a manufacturer to restrict the territory in which a distributor operates are to be examined under the rule of reason standard." *Oreck v. Whirlpool Corp.,* 579 F.2d 126, 129 n. 4 (2nd Cir.1978), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

11. The court's expansive discussion on this matter can be read at *Continental,* 433 U.S. at 49–59, 97 S.Ct. at 2557–62.

*Seed*, 810 F.2d at 1295; *Gouch*, 585 F.2d at 389 (judgment for plaintiff reversed for failure to establish relevant geographic markets).

■ Assuming without deciding that BKC imposed some sort of territorial allocation or exclusive dealing requirement upon its franchisees, such a nonprice vertical restraint would be judged under the rule of reason. *Continental, supra.*[12] The court is hard-pressed to conduct the requisite analysis under the rule of reason because plaintiff has put forth no evidence, other than its personal beliefs, by which the court may determine the relevant geographic and product markets. *See Chuck's Feed & Seed*, 810 F.2d at 1295; *Gouch*, 585 F.2d at 389.

Assuming, without deciding, that the relevant market is as plaintiff asserts, fast foods in the Carowinds area, plaintiff has failed to put forth *any* evidence that interbrand competition was adversely affected by BKC's rejection of its application for a restaurant at the Carowinds site. *Continental*, 433 U.S. at 58–59, 97 S.Ct. at 2562; *see* Blanton, 163; Grimm, 138. Plaintiff admitted at the February 4, 1988, hearing that except for its failure to receive approval to build a Burger King at the Carowinds exit, it could state no effect upon interbrand competition. Additionally, given BKC's relatively small (7.5%—10%) market share of the fast food industry, BKC lacked the power to adversely affect interbrand competition in an obviously highly competitive industry. Plaintiff's failure to put forth any evidence of an adverse anticompetitive effect further supports the grant of summary judgment on the § 1 claim. The court, therefore, finds that the failure to raise a reasonable inference that defendants' alleged actions had an adverse anticompetitive effect is a separate and independent ground for granting summary

judgment on the § 1 claim. Rule 56(c), Fed.R.Civ.Proc.[13]

### Antitrust Injury

■ Plaintiff in this case seeks treble damages pursuant to 15 U.S.C. § 15. To recover here, plaintiff must show injury to his business or property by reason of a violation of the antitrust laws. 15 U.S.C. § 15. Plaintiff must show actual injury, *Story Parchment Co. v. Paterson*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), and a causal connection between the injury and the violation of antitrust laws. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 481, 97 S.Ct. 690, 693, 50 L.Ed.2d 701 (1977).

■ To the extent defendants' conduct increased interbrand competition, plaintiff's alleged injury would not flow from the kind of conduct the antitrust laws are intended to prevent. *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 698. Additionally, for the reasons stated *supra*, the court has found that no antitrust violation has occurred in this case. Consequently, any injury allegedly suffered by plaintiff would not flow from acts which the antitrust laws are intended to prevent. *Id.* Finally, the court notes that plaintiff has not raised a reasonable inference that it has suffered any injury at all. By its own admission, the profitability of the Denny's restaurant, which it opened at the Carowinds site, will yield significantly greater profits than those it could have reasonably achieved with a Burger King franchise at this site. Blanton, 147–49; Grimm, 127–28, 130–33, 136–38. Therefore, as a third separate and independent ground, the court grants summary judgment in this matter for failure to raise a reasonable inference of antitrust injury. Rule 56(c), Fed.R.Civ.Proc.

### Unfair Trade Practices Act

The South Carolina Unfair Trade Practices Act (hereinafter "UTPA") provides that:

the interjection of plaintiff's Denny's franchise on the Carowinds site where he had hoped to build his Burger King restaurant. *See* BKC exhibit 22 (Shoney's is a competitor of BKC, and Shoney's is also a competitor of Denny's.); Blanton, 139–41; West, 28, 73–74.

**12.** Plaintiff's assertions of a concerted refusal to deal/group boycott and a horizontal territorial allocation are devoid of merit and are discussed *infra*.

**13.** It is not an unreasonable inference to hold that interbrand competition was increased by

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

S.C.Code Ann. § 39–5–20(a) (Law.Co-op. 1976). The UTPA may not be used to redress a mere private grievance not affecting the public interest. *Noack Enterprises, Inc. v. Country Corner Interiors, Inc.*, 290 S.C. 475, 351 S.E.2d 347 (Ct.App. 1986), *appeal dismissed,* 363 S.E.2d 688 (1987). An ordinary breach of contract does not give rise to a claim under the UTPA. *Puliam Investment Co. v. Cameo Properties,* 810 F.2d 1282, 1287 (4th Cir. 1987) (UTPA requires more than breach of written contract.); *Key Co. v. Fameco Distributors, Inc.*, 292 S.C. 524, 357 S.E.2d 476 (Ct.App.1987) (no UTPA violation for breach of oral contract where only contracting parties are affected). Section 39–5–20(b) states that courts construing the UTPA should be guided by the decisions of the Federal Trade Commission and federal courts interpreting § 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

Before beginning analysis of this claim, the court notes that plaintiff admitted at the February 4, 1988, hearing on this matter that should the court find there is no reasonable inference of a violation of § 1 of the Sherman Act, then its UTPA claim would also fall. For the reasons cited *supra,* the court has concluded that no antitrust violation may be inferred under the facts of this case. Consequently, by plaintiff's own admission, its UTPA claim must also fail and suffer dismissal by summary judgment. Rule 56(c), Fed.R.Civ.Proc.[14] Therefore, because defendants have pointed to the absence of any genuine issue of material fact and because plaintiff has failed to put forth evidence which viewed in the light most favorable to it, may reasonably be inferred to constitute an unfair trade practice violation, the court grants defendants' motion for summary judgment on plaintiff's unfair trade practice count. Rule 56(c), Fed.R.Civ.Proc.[15]

### Wrongful Termination

In order to make out its claim against BKC for wrongful termination of a franchise agreement, plaintiff must establish: (1) the existence of a franchise agreement; (2) that BKC terminated the agreement in a malicious or arbitrary manner; and (3) the absence of reasonable business justification for the termination. *Richland Wholesale Liquors v. Glenmore Distilleries,* 818 F.2d 312, 315–17 (4th Cir.1987); *Glaesner v. Beck/Arnley Corp.,* 790 F.2d 384, 388–90 (4th Cir.1986); *de Treville v. Outboard Marine Corp.,* 439 F.2d 1099, 1100 (4th Cir. 1971); *Philadelphia Storage Battery Co. v. Mutual Tire Stores,* 161 S.C. 487, 159 S.E. 825, 826–27 (1931). The court finds that the evidence presented on these essential elements has created no genuine issues of material fact and BKC is entitled to judgment as a matter of law. Therefore, the court is compelled to grant BKC's motion for summary judgment on this claim. Rule 56(c), Fed.R.Civ.Proc.

**14.** Although it was neither clear in plaintiff's brief nor in his discussion of this matter at the February 4, 1988, hearing, plaintiff seemed to insinuate that acts which have the potential for repetition can constitute an unfair trade practice. Plaintiff cited *Noack* for this proposition. However, plaintiff misconstrues the thrust of *Noack.* The *Noack* court unambiguously stated that "[a]n unfair or deceptive trade practice that affects only the parties to a trade or commercial transaction is beyond the Act's embrace and we so hold." *Id.* 290 S.C. at 479, 351 S.E. at 349–50. The fact that the defendants in this case could repeat their acts, none of which may be inferred to have violated the applicable laws, cannot be deemed to have affected the public interest *unless* they are first adjudged unfair or deceptive trade practices. The potential for repetition is only used to satisfy the public interest component necessary to bring an unfair trade practice within the scope of the UTPA. Otherwise, any act, regardless of its blatant legality, would become an unfair trade practice merely by its capability to be repeated. Such is not, and could not be, the import of the UTPA or *Noack.*

**15.** Although it remains very unclear, plaintiff may have been alleging that an exclusive dealing arrangement violated the UTPA. To the extent an ultra-liberal construction of plaintiff's complaint and memorandum in opposition to the motion for summary judgment are capable of such a construction, plaintiff's argument fails to meet the requirements set forth in *Chuck's Feed & Seed,* 810 F.2d at 1295. There is simply no evidence of the effects of defendants' acts on competition. *Id.*

## Existence of a Franchise Agreement

■ First, plaintiff has not met its burden of coming forward with evidence that supports the existence of a franchise agreement. *W.E. Gilbert & Associates v. South Carolina National*, 285 S.C. 421, 330 S.E. 2d 307 (Ct.App.1985). BKC has longstanding, clearly articulated policies and procedures for awarding franchises. One of its policies is to require several written "approvals" before it awards a franchise. A franchise applicant's first step is to acquire franchise approval, which is the culmination of three separate approval steps: legal, operational, and financial. When granted, franchise approval is communicated to the applicant by BKC's regional vice president in the form of a letter. After BKC grants franchise approval, the parties execute a preliminary agreement. BKC then issues the applicant an "A" number.

BKC also requires an applicant to obtain site approval, which, when granted, is also communicated by the regional vice president in the form of a letter. Once an applicant has received both franchise and site approval, BKC must also approve the specific site plans for the restaurant in question, and the applicant must obtain the permits and variances necessary to begin construction. Once all this has occurred, the applicant receives a "BK Number." Lastly, the parties execute a final franchise agreement, which governs their relationship during the twenty year period called for in the agreement, and the new franchisee pays BKC a franchise fee.

Plaintiff was more than aware of BKC's franchise approval procedures described above. In fact, Wiley Blanton, who currently owns six Burger King franchises, previously worked for BKC for eight years, held numerous positions in the company (including regional manager), and "became very familiar with Burger King policies and procedures, including those pertaining to the franchising of new restaurants." Plaintiff's brief at p. 2. Plaintiff concedes that it did not receive a franchise approval letter,[16] a site approval letter, an "A number," or a "BK number." Blanton, 49–51. Nor did plaintiff procure the permits and variances necessary to begin construction. Grimm, 71–72. Plaintiff further concedes that the parties never executed a preliminary agreement, much less a final franchise agreement, and plaintiff never paid BKC a franchise fee for the alleged Carowinds franchise. Blanton, 49.

Plaintiff alleges, however, that BKC does not always insist upon compliance with its official franchising procedures before awarding a franchise. Plaintiff alleges that BKC employees (on the regional level) orally represented that it had been awarded a franchise at the Carowinds site. Wiley Blanton testified in his deposition that "Mr. Keeler [franchise district manager for Atlanta], again, asked us to develop—or told us to develop that site [Carowinds], that we *should* have no problems, it was ours. Sometimes it was told to me, sometimes to Carl [Grimm]. I can't give you a date on it, but on numerous occasions, that was said." Blanton, 284 (em-

**16.** As mentioned earlier, in order to obtain franchise approval plaintiff needed legal, operational, and financial approval. Plaintiff concedes that it never received legal approval. Blanton, 47. Although it is undisputed that plaintiff had obtained operational approval (which merely indicates that plaintiff was operating its existing franchises in a satisfactory manner), BKC specifically notified plaintiff by letter dated December 2, 1985, that it did not have financial approval because its debt-to-equity ratio was "unacceptable." *See* BKC exhibit 19. Plaintiff claims that it responded to the letter by telephoning John Caffey, BKC's regional franchising manager, who allegedly told plaintiff that it could obtain financial approval by contributing more capital to the corporation or demonstrate

that operating revenues would be sufficient to service the debt. Plaintiff goes on to assert that after the conversation with Caffey, it "understood" that it had been granted financial approval. *See* plaintiff's brief at p. 16. This contention, however, is inconsistent with plaintiff's own characterization of the conversation. Plaintiff stated that Caffey told it that financial approval would be "forthcoming" when plaintiff remedied its debt-to-equity ratio. *Id.* This certainly did not occur over the telephone, and the record does not reflect that plaintiff ever reduced its debt-to-equity ratio to a level satisfactory for obtaining financial approval. On the contrary, plaintiff was informed by letter dated February 2, 1986, that it did not have financial approval. *See* BKC exhibit 6.

phasis added).[17] Grimm also testified that BKC employees told him that plaintiff had been awarded the Carowinds franchise. Grimm, 55. Plaintiff's employee Donald Hilliard testified that around the middle of November, 1985, BKC's Randy Keeler told he and Grimm that "It's official." Hilliard, 25, 96. Hilliard later said that he understood "It's official" to mean plaintiff had been awarded the Carowinds franchise. Hilliard, 96. Plaintiff contends that these alleged oral representations constitute an oral franchise agreement.

BKC, however, argues vehemently that there is no such thing as oral approvals[18] or an oral franchise agreement and points out that BKC employees have denied the statements attributed to them.[19] BKC further contends that these oral representations, even if made, do not constitute a contract, but are, at best, expressions of hope, opinion, or belief that written approvals would be forthcoming at a later date provided the plaintiff completed the requisite franchising steps.[20]

Assuming, *arguendo*, that the representations in question were made and could reasonably be construed as promises and not expressions of hope, opinion, or belief, plaintiff has still failed to come forward with evidence of an oral contract sufficiently definite in its terms to be enforceable under South Carolina law. According to the South Carolina Supreme Court in *Edens v. Laurel Hill, Inc.*, 271 S.C. 360, 247 S.E.2d 434, 436 (1978), "It is well set-

tled in South Carolina that in order for there to be a binding contract between the parties, there must be a mutual manifestation of assent to the terms ... the assent must be as to all of the terms of contract." *See also Aperm of South Carolina v. Roof,* 290 S.C. 442, 351 S.E.2d 171, 173 (Ct.App.1986) (material terms must not be left for future settlement).

In its answers to defendants' interrogatories, plaintiff admits that "[a]ll of the terms of the franchise agreement were not discussed between plaintiff Blanton and defendant BKC." Plaintiff's answer no. 2(c) to BKC's interrogatories at p. 6. Again, in its brief, plaintiff stated that by making the alleged oral representations "BKC intended to award the Carowinds/Fort Mill Franchise, *with reasonable terms to be specified at a later time.*" Plaintiff's brief at p. 70; (emphasis added). Based on plaintiff's own allegations, the court must conclude that plaintiff never had an oral agreement sufficiently definite to be enforceable under South Carolina law. *Edens; Roof.*

Even assuming, however, that the parties did have a sufficiently definite oral franchise agreement, it would still be unenforceable under South Carolina law since the undisputed facts and circumstances of this case demonstrate that the parties intended to be bound only after BKC issued written approvals and the parties reduced their agreement to writing. In *Bugg v. Bugg,* 272 S.C. 122, 249 S.E.2d 505, 507

---

**17.** Notably, the phrase "we *should* have no problems" is inconsistent with "it was ours."

**18.** By letter dated February 2, 1986, Robert Gumm, BKC's regional vice president, responded to Carl Grimm's contention that plaintiff had "implied [site] approval":

> I must take exception to your statement of receiving 'implied [site] approval' from my office and/or various departments in the Atlanta region. Approval of real estate locations for franchises are never implied. Burger King Corporation has explicit policies and procedures for approval of proposed new restaurant locations.... With the exception of ... [operational approval], you do not have any of the above approvals. Also, to date, you do not have franchise approval.

BKC exhibit 6. Fox also testified in his deposition that "[i]n my experience for the eleven

restaurants that I have opened, there is no such thing as oral approval." Fox, 14.

**19.** *See* Gumm, 75–76, 82–82; Allgood, 101–06; Keeler, 54–56; Reardon, 25–26; Caffey, 63–64; Nix, 49–51.

**20.** As BKC correctly notes, expressions of hope, belief, or opinion; preliminary negotiations; and agreements to agree do not amount to a contract in South Carolina. *See Craven v. Williams,* 302 F.Supp. 885 (D.S.C.1969) (preliminary negotiations not intended or represented to be the final agreement of the parties do not support a right to specific performance); *Savannah Guano Co. v. Fogle,* 112 S.C. 234, 100 S.E. 59 (1919) (no contract where only a promise to enter into a contract in the future); *Holliday v. Pegram,* 89 S.C. 73, 71 S.E. 367 (1911) (no contract where defendant promised to make a contract or arrange an agreement at a future date).

(1978), the South Carolina Supreme Court held that "[w]hether the parties to an oral or informal agreement bec[o]me bound prior to the execution of a contemplated formal writing is a question depending largely upon their intention." *See also Julius Kayser & Co. v. Textron, Inc.*, 228 F.2d 783, 790 (4th Cir.1956). According to the court in *Bugg*, "where it is determined that the parties intended not to be bound until the written contract is executed, no valid and enforceable obligation will be held to arise." 272 S.C. at 125, 249 S.E.2d at 307. Whether the parties intended to be bound by an oral agreement prior to the execution of an anticipated writing is determined by the "surrounding facts and circumstances of each particular case." *Id.*[21]

Courts generally agree that the subjective intent of one of the parts is irrelevant in determining at what point they intended to be bound. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir.1987) ("Secret hopes and wishes count for nothing.") Instead, most courts take an objective view of intent, which they derive from a consideration of the surrounding facts and circumstances. *Id; R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2nd Cir.1984).

In *R.G. Group*, plaintiffs claimed to have made an oral agreement with Bojangles' of America, Inc. (hereinafter Bojangles'), in which Bojangles' agreed to grant plaintiffs the exclusive right to develop and operate some twenty Bojangles' franchises. At the beginning of the negotiations, Bojangles' gave plaintiffs a copy of its standard form development franchise agreement, which both parties understood they could modify slightly. The agreement specifically provided that it would be binding when executed: " 'This is your Development Franchise Agreement; when duly executed it sets forth your rights and your obligations to Bojangles' and Bojangles' rights and obligations to you.' " *Id.* at 71.

Bojangles' franchising committee eventually refused to approve plaintiffs' application, and the parties never executed the development franchise agreement. Plaintiffs brought suit alleging breach of agreement to grant franchises and promissory estoppel. Plaintiffs claimed to have an oral franchising agreement, which they based upon a telephone conversation between its agent and Bojangles' attorney. Plaintiffs alleged that in that conversation the parties " 'reached a meeting of the minds on all the material matters of the contract.' " *Id.* at 73. Further, plaintiffs' agent testified in his deposition that Bojangles' attorney told him, in the same telephone conversation, that "we have a handshake deal today and right now." *Id.*

Relying upon the above-quoted language from the development franchise agreement and a letter sent by Bojangles' to plaintiff that referred to a written final agreement, the district court found that the parties had intended to be bound only by a written agreement and granted Bojangles' motion

**21.** Citing *Bugg*, the South Carolina Court of Appeals in *Reed v. Boykin*, 282 S.C. 614, 320 S.E.2d 68, 69 (Ct.App.1984) held that "where the parties intend to reduce some material part of a contract to writing, and it is not reduced to writing, there is no contract." Plaintiff could not possibly establish an enforceable franchise agreement if this is controlling law since both parties clearly contemplated reducing their entire agreement to a formal writing and never did. *See* plaintiff's complaint at ¶ 23; plaintiff's brief at pp. 9–10; BKC exhibit 21 (preliminary agreement executed by plaintiff for prior franchise); BKC exhibit 23 (franchise agreement executed by plaintiff for prior franchise). The court suggests, however, that the *Reed* holding is logically inconsistent with *Bugg* and, therefore, not controlling here.

According to *Bugg*, the parties are free to agree that they will be bound immediately by an oral agreement even though they contemplate reducing it to writing at a later date. If the parties so agree and the contemplated writing is never executed, the parties are still left with an oral agreement they intended and agreed to be bound by immediately. Assuming there are no valid affirmative defenses, a court would be compelled by universally accepted contract doctrine to enforce the parties oral agreement because courts are not in the business of unmaking contracts any more than they are in the business of making them. *See* 1A. Corbin, *Corbin on Contracts* § 30, at 98 (1963). For this reason, the court concludes that the principle announced in *Reed* is an impermissible extrapolation of the supreme court's decision in *Bugg*. Notably, this court's independent research failed to turn up any cases that support the view adopted in *Reed. See generally* cases cited at West Digest Key Number–Contracts 32.

for summary judgment. Applying the same rule of law set forth in *Bugg*, the Second Circuit affirmed. According to the Second Circuit,

> When a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.
>
> Freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex business dealings. In these circumstances there are often forceful reasons for refusing to make a binding contract unless it is put in writing.

*Id.* at 75.

The court went on to list and apply four factors courts have looked to in deciding whether the parties intended to be bound only upon execution of a writing. These factors are: (1) has one party explicitly indicated that it would be bound only by a writing; (2) has one party partially performed and the performance been accepted by the other party disclaiming the contract; (3) do the parties have much or little left to negotiate; and (4) does the agreement concern complex business matters that are usually reduced to writing. The Second Circuit found that all these factors unequivocally required granting Bojangles' motion for summary judgment.

With respect to factor one, the court placed much importance on the clause of the development franchise agreement that said the agreement would govern the parties' rights and duties "when duly executed." Conversely, the court placed little importance on Bojangles' attorney's alleged oral representation that the parties had a "handshake deal" since he did not also explicitly waive the requirement that the agreement be in writing. *Id.* at 74. With respect to the second factor, the court found no partial performance by either party, just preliminary negotiations and actions taken by plaintiffs to get their application approved. With respect to the third factor, the court found that the parties never agreed to all of the terms of their agreement. Most importantly, they had

yet to agree upon the size of plaintiffs' franchise territory. Finally, with respect to factor four, the court said:

> Certainly this is the kind of agreement where it would be unusual to rely on an oral understanding. Bojangles' franchise contracts run for twenty years and cover detailed matters of capital structure for franchisees, purchase and development of real estate, construction of stores, trade secrets, transfers of interest, and rights on termination or default. Perhaps most telling is the fact that the parties were talking about an initial investment of some two million dollars, and that the plaintiffs' complaint alleges lost income, profits, and injuries of 'at least' eighty million dollars. With that amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone.

*Id.* at 77.

As in *R.G. Group*, this case presents the question of whether the parties' alleged oral franchise agreement was to be binding only upon execution of the written franchise agreement that both parties clearly contemplated. *See supra* note 21. After applying the four factors listed above to the facts of this case, the court finds that the evidence on these factors is overwhelmingly in BKC's favor.

With respect to factor one, BKC makes it clear in its standard franchise application form that "any grant of a franchise will be conditioned on the fulfillment of the then current franchising requirements and the conditions contained in any franchise approval which might be granted." Blanton's deposition exhibit 1. As discussed earlier, plaintiff understood well that "current franchising requirements" included written approvals, a signed preliminary agreement, and a signed franchise agreement. In addition, the franchise agreements plaintiff had signed in the past provided that "[t]his agreement shall become valid *when executed* and accepted by Burger King Corporation at Miami, Florida ..." Blanton's deposition exhibit 11. Furthermore, in a letter dated February 2, 1986, BKC advised

plaintiff that there was no such thing as "implied approval." *See supra* note 18. Letters sent to plaintiff regarding earlier franchises also made it clear that BKC intended to be bound only by a writing. For example, on August 25, 1983, plaintiff was sent a letter in connection with a potential Rock Hill franchise that read: "Your franchise approval is contingent upon your signing and returning the [Preliminary] Agreement on or before September 12, 1983.... You should make no attempt to acquire this site until you have received written approval from Burger King Corporation, as well as all necessary permits." Blanton's deposition exhibit 2. On the other hand, the court is unaware of a single statement, written or oral, that suggests the parties intended to be bound by any alleged oral franchising agreement before it was reduced to writing. These facts cut hard against plaintiff. *R.G. Group*, 751 F.2d at 74; *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2nd Cir. 1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (intent not to be bound except by writing "conclusively establish[ed]" when neither party took exception during negotiations to phrase in draft contract which stated "when executed and delivered, this Agreement ... will be a valid and binding Agreement"); *Ashton v. Chrysler Corp.*, 261 F.Supp. 1009 (E.D.N.Y.1965) (no contract where dealership application required signed franchise agreement and there was no signed agreement).

Plaintiff fairs no better on the second factor—the acceptance of partial performance. Neither party performed any part of the alleged franchise agreement. The only actions plaintiff took are properly characterized as preparatory to obtaining the necessary approvals to be a Burger King franchisee at the Carowinds site.

The third factor—whether the parties had little or much left to negotiate—also cuts against the plaintiff. As mentioned earlier, plaintiff admits that it and BKC never reached agreement or even discussed all of the terms of the alleged franchise agreement. *See* plaintiff's answer no. 2(c) to BKC's interrogatories at p. 6. Again in its brief, plaintiff conceded that reasonable terms were to be specified at a later date. *See* plaintiff's brief at p. 70. Notably, neither party has attempted to set forth exactly which terms, if any, had been discussed and agreed to and which terms had been left for future agreement.

With respect to the fourth factor, the Second Circuit's reasoning in *R.G. Group* is particularly relevant. As in that case, the franchise agreement here was to last for twenty years, contains numerous details regarding capital structure for franchisees, development of real estate, store construction, trade secrets, assignment of interests, and rights on termination and default. As in *R.G. Group*, plaintiff here is also seeking incidental damages, lost profits, and punitive damages in the millions of dollars. This court agrees with the Second Circuit that reasonable, prudent businessmen could only conclude that such an agreement would have to be in writing and executed before it became binding. *R.G. Group*, 751 F.2d at 77; *see also Julius Kayser & Co. v. Textron, Inc.*, 228 F.2d 783, 790 (4th Cir.1956) ("The inherent probability would certainly be that the parties would intend that a contract involving the payment of some $800,000 rent, plus taxes and insurance for eleven years would be [binding only] by a written agreement.").

In summary, a review of the parties objective intent (as revealed in relevant documents, deposition testimony, and correspondence) convinces the court that a jury could reach but one conclusion—the parties intended to be bound only after plaintiff had received the requisite written approvals and they had reduced their agreement to a signed writing. Therefore, under the doctrine espoused in *Bugg*, plaintiff cannot establish that it ever had an enforceable franchise agreement with BKC.

### Maliciousness

Even if plaintiff could establish the existence of an enforceable oral franchise agreement, it could not recover for wrongful termination under South Carolina law because the undisputed facts of this case also demonstrate that the alleged franchise agreement was not terminated in a mali-

cious manner. Plaintiff claims that BKC's termination of the alleged franchise agreement was a tortious act, which requires a finding of maliciousness in this state. *Richland Wholesale Liquors v. Glenmore Distilleries*, 818 F.2d 312, 315–17 (4th Cir. 1987); *Glaesner v. Beck/Arnley Corp.*, 790 F.2d 384, 388–90 (4th Cir.1986); *Philadelphia Storage Battery Co. v. Mutual Tire Stores*, 161 S.C. 487, 159 S.E. 825, 826–27 (1931). "The malice required under South Carolina law ... is not directed to the intent or motivation behind the termination of the contract. Rather, the focus is on whether there was malicious or arbitrary conduct in bringing about termination." *Richland Wholesale Liquors*, 818 F.2d at 317. Courts applying South Carolina law have found maliciousness in only exceptional cases. *See Philadelphia Storage Battery Co. v. Mutual Tire Stores*, 161 S.C. 487, 159 S.E. 825 (1931) (distributor terminated at the height of selling season without notice); *Gaines W. Harrison & Sons, Inc. v. J.I. Case Co.*, 180 F.Supp. 243 (E.D.S.C.1960) (distributor terminated without notice in order for the supplier to avoid warranty obligations and destroy distributor's business, 90% of which was dependent on supplier's products); *deTreville v. Outboard Marine Corp.*, 439 F.2d 1099 (4th Cir.1971) (termination of a distributor who had invested heavily in specialized equipment, parts, and tools without any buy-back).

Plaintiff rests its entire claim of maliciousness on Tony Rolland's decision to deny plaintiff the Carowinds location after only a brief trip to the site and surrounding area. *See* plaintiff's brief at pp. 66–67. The action plaintiff points to does not even approach maliciousness under the cases cited above. Furthermore, the court's own exhaustive review of the record also has not revealed even the smallest piece of evidence that BKC terminated the alleged agreement in a malicious manner. On the contrary, Rolland's decision was communicated personally to Wiley Blanton by BKC's executive vice president, William Prather. Prather, 34–35. Rolland also spoke with Grimm personally to explain his decision. Rolland, 196. Gumm even encouraged plaintiff to appeal Rolland's decision to BKC's ombudsman, which plaintiff failed to do. *See* BKC exhibit 24.[22] Far from suffering the destruction of its business, plaintiff continues to operate six Burger King franchises, plus a newly opened Denny's on the site in question. These undisputed facts render hollow plaintiff's contention that BKC's conduct towards it was malicious. *See Richland Wholesale Liquors*, 818 F.2d at 317.

### Reasonable Business Justification

Finally, even if plaintiff could establish an enforceable oral franchise agreement and its malicious termination by BKC, it could still not recover under a wrongful termination cause of action because the evidence presented establishes that BKC had a reasonable business justification for the alleged termination—to prevent cannibalization and potential ruin of another Burger King franchise and consequential weakening of the BKC chain. It is not for the court or juries to second guess the kind of business decisions at issue here. *Richland Wholesale Liquors*, 818 F.2d at 317. The Fourth Circuit's observation in *Glaesner* is particularly relevant here: "... divergent versions of the facts and ... casting of blame are common when expectations engendered by business dealings fail to materialize. Mutual recrimination and suspicion may typify times when ... dealings turn sour. Such differing views do not, however, ordinarily give rise to an action in tort or create a jury question as to which party's version of business reality is the right one." 790 F.2d at 387.

For the foregoing reasons, the court is compelled to grant BKC's motion for summary judgment on plaintiff's claim of wrongful termination.[23]

---

**22.** Notably, Blanton contends that Prather told him the ombudsman had no power to overturn Rolland's decision, but could only make a recommendation. Blanton, 199–200.

**23.** Because the court finds that plaintiff cannot establish any of the essential elements of wrongful termination, the court need not address BKC's Statute of Frauds defense to the contract element of this cause of action. The court

### Promissory Estoppel

Plaintiff's fourth cause of action, directed only against defendant BKC, is based upon the doctrine of promissory estoppel. Plaintiff contends that because it relied to its detriment on BKC employees' oral representations that it had been awarded the Carowinds franchise, it is entitled to incidental damages, lost profits, and punitive damages.

South Carolina courts have recognized and applied promissory estoppel as an independent cause of action on several occasions. *Higgins Construction Co., Inc. v. Southern Bell Telephone & Telegraph Co.*, 276 S.C. 663, 281 S.E.2d 469 (1981) (Southern Bell held liable under promissory estoppel theory for reliance damages plaintiff suffered when Southern Bell failed to remove telephone wires by date promised, which delayed plaintiff's construction schedule.); *Powers Construction Co. v. Salem Carpets, Inc.*, 283 S.C. 302, 306, 322 S.E.2d 30, 33 (Ct.App.1984) ("[W]e have no doubt that ... [promissory estoppel] can support an action in this state by a contractor who has submitted a prime bid in reliance upon a subcontractor's bid."). The elements of promissory estoppel in South Carolina are:

> (1) the presence of a promise unambiguous in its terms; (2) reasonable reliance upon the promise by the party to whom the promise is made; (3) the reliance is expected and foreseeable by the party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise.

*Salem Carpets*, 283 S.C. at 306, 322 S.E.2d at 33.

■ The court earlier concluded that plaintiff never had an enforceable oral franchise agreement because the facts and circumstances of this case indicated unequivocally that the parties did not intend to be bound until their alleged agreement had been reduced to writing. *Bugg v. Bugg*, 272 S.C. 122, 249 S.E.2d 505, 507 (1978). This conclusion raises what the court believes to be the threshold issue in resolving plaintiff's promissory estoppel cause of action: Would allowing plaintiff in this case to recover damages under a promissory estoppel theory undermine the contract principle announced in *Bugg* that the parties may control the time at which they intend to be bound by an oral promise? The court holds that where, as here, the facts and circumstances of a case demonstrate that the parties to an alleged oral promise did not intend to be bound until they had reduced the promise to writing and this never occurred, one party cannot recover on that promise under a promissory estoppel theory. To hold otherwise would undermine the universally recognized contract principle that the parties to a promise may control the time at which it becomes obligatory. The court is confident that, if presented with the issue, the South Carolina courts would likewise construe the promissory estoppel doctrine in such a way that it compliments, rather than undermines, traditional contract principles.

■ Even if the court concluded that promissory estoppel was available here,

notes, however, that the South Carolina Court of Appeals apparently has adopted promissory estoppel as an exception to both the general Statute of Frauds, S.C.Code Ann. § 32–3–10 (Law.Co-op.1976), and the Uniform Commercial Code's version, 36–2–201 (Law.Co-op.1976). *See Atlantic Wholesale Co., Inc. v. Solondz*, 283 S.C. 36, 320 S.E.2d 720, 723–24 (Ct.App.1984) (Court enforced oral contract to buy 300 ounces of silver and estopped defendant from asserting Statute of Frauds as a defense where silver dealer relied to its detriment upon oral promises.); *Collins Music Co., Inc. v. Cook*, 281 S.C. 580, 316 S.E.2d 418, 420 (Ct.App.1984) (Court refused to estop defendant from asserting statute of frauds where plaintiff could show no detrimental reliance on defendant's alleged oral

promise to assume a prior written contract regarding lease of game machines.) Although the court in *Solondz* labeled the form of estoppel it applied "equitable," it clearly applied promissory and not equitable estoppel principles. Notably, the case involved no misrepresentations of present or past fact, but only a promise of future performance. The court of appeals in these two cases apparently rejects this court's opinion in *McDabco, Inc. v. Chet Adams Co.*, 548 F.Supp. 456 (D.S.C.1982) that South Carolina, if presented with the issue, would refuse to adopt promissory estoppel as an exception to the Statute of Frauds. As discussed *infra*, however, plaintiff cannot establish the elements of promissory estoppel. Therefore, *Solondz* and *Collins Music* provide him no assistance here.

plaintiff cannot satisfy its elements. First, the court cannot conclude that the alleged oral statements you "should have no problems, it [the Carowinds franchise]" is yours and "It's official" are promises unambiguous in their terms. These statements, made at a time when the parties admittedly had not yet agreed to the terms of the franchise agreement, are at best ambiguous.

 Secondly, plaintiff could not have reasonably relied on oral promises that it had been awarded the Carowinds franchise when the facts and circumstances demonstrated unequivocally that the parties intended to be bound only by a signed writing. *See supra* discussion at pp. 769–74. BKC franchise agreements are complex and detailed. They bind the parties for twenty years and involve millions of dollars. In the words of the Second Circuit in *R.G. Group*, "[w]ith that amount of money at stake, a requirement that the agreement be in writing and executed simply cannot be a surprise to anyone." 751 F.2d at 69. It especially cannot be a surprise to sophisticated businessmen like plaintiff's principals, Wiley Blanton and Carl Grimm, who had almost forty years of combined experience in BKC's franchising system. *See* plaintiff's brief at p. 5. For these same reasons, BKC could not have expected or foreseen plaintiff's alleged reliance on their employees' alleged oral representations. Notably, plaintiff's counsel at oral argument conceded that if the court found that the parties intended to be bound only by a writing, it could not find that the plaintiff reasonably relied on BKC's alleged oral representations.

 Lastly, even if plaintiff could establish the other elements of this cause of action, it has no damages recoverable under a promissory estoppel theory. As discussed earlier, plaintiff's own projections indicated that it would make considerably more profit operating a Denny's at the Carowinds site than a Burger King. Blanton, 147–49; Grimm, 127–28, 130–37, 136–38. Therefore, by plaintiff's own admis-

sions, it would not be entitled to any lost profits. But even if plaintiff could show lost profits, they would not be recoverable under a promissory estoppel theory of recovery. *RCM Supply Co., Inc. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1079 (4th Cir.1982). According to the Fourth Circuit, "[d]amages recoverable under a claim of detrimental reliance are carefully circumscribed; the plaintiff may recover only those expenditures made in reliance upon defendant's promise." In support of its finding, the court quoted an illustration by the American Law Institute that is particularly relevant to this case:

> A applies to B, a distributor of radios manufactured by C, for a 'dealer franchise' to sell C's products. Such franchises are revocable at will. B erroneously informs A that C has accepted the application and will soon award the franchise, that A can proceed to employ salesmen and solicit orders, and that A will receive an initial delivery of at least 30 radios. A expends $1,150 in preparing to do business, but does not receive the franchise or any radios. B is liable to A for the $1,150 but not for the lost profit on 30 radios.

Restatement (Second) of Contracts § 90, comment d, illustration 8 (1981); *see Goodman v. Dicker*, 169 F.2d 684 (D.C.Cir.1948) (Plaintiff who acted in reliance on promise of a franchise could only recover damages sustained in preparing to do business, and trial court erred in allowing recovery for lost profits.); *see also Green v. Interstate United Management Services Corp.*, 748 F.2d 827, 831 (3rd Cir.1984) (District Court did not err in limiting recovery on estoppel claim to reliance damages and refusing to allow full scale enforcement of the promise allegedly relied upon given its manifestly contingent nature.); *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex.1965) ("Under promissory estoppel, losses of expected profits will not be allowed even if expected profits are provable with certainty."). Therefore, plaintiff's recovery under a promissory estoppel theory is restricted to its reliance damages.[24]

**24.** Although plaintiff, in its complaint, did not

specifically request punitive damages on its

■ By letter dated January 22, 1988, the court directed a number of interrogatories to plaintiff regarding its promissory estoppel cause of action. One of those interrogatories reads: "With regard to each ... [alleged reliance], indicate when it occurred, its monetary value, and whether it would also have been a necessary step in building the Denny's Restaurant plaintiff currently operated on the site in question." In response, plaintiff catalogued $4,727.00 [25] in alleged reliance damages. The court also asked plaintiff to "specify which actions were taken in reliance on which statements [allegedly made by BKC employees]." Plaintiff indicated that it incurred $4,091.00 [26] of the above amount in response to a discussion with BKC's Ken Allgood which took place in July, 1985, months before the alleged oral promises were made. See plaintiff's answer II.A. to court interrogatories. Because this amount was not incurred in reliance on BKC's alleged assurances that plaintiff had the Carowinds franchise, it is not recoverable under a promissory estoppel theory. Plaintiff indicated that the remaining $636.00, which represents legal fees for a lease on the Carowinds site, was incurred in September, 1985, in response to Robert Gumm's grant of oral site approval. See plaintiff's answer II.B. to court interrogatories; Blanton's deposition exhibit 15. Again, by plaintiff's own admission, this expense also was not incurred in response to any alleged oral franchise agreement. Plaintiff's counsel represented at oral argument that BKC did not promise orally that plaintiff had the Carowinds franchise until mid-November when Randy Keeler allegedly told Carl Grimm and Donald Hilliard that "It's official." In short, plaintiff's answers to the court's interrogatories reveal that plaintiff did not incur any expenses in reliance on BKC's alleged oral award of the Carowinds franchise. Although at oral argument plaintiff mentioned that he thought plaintiff had suffered some reliance damages after Keeler's representations in mid-November, he could not be specific. The court gave plaintiff every conceivable opportunity to prove the nature and extent of its alleged reliance damages, and plaintiff failed to do so.[27]

## Tortious Interference with a Contract

■ In order to establish a cause of action against defendants Fox and Woodlo for tortious interference with a contract, plaintiff must show: (1) there was a valid, enforceable contract; (2) defendants had knowledge of the contract; (3) defendants intentionally procured its breach; (4) the absence of business justification; and (5) damage resulting from the breach. *DeBerry v. McCain*, 275 S.C. 569, 274 S.E.2d 293, 296 (1981); *Chitwood v. McMillan*, 189 S.C. 262, 1 S.E.2d 162, 164 (1939).[28] The court

---

promissory estoppel claim, it does assert that it is entitled to punitives in its 16(b) interrogatories. Plaintiff is mistaken. Promissory estoppel is an equitable doctrine, *Atlantic Wholesale Co., Inc. v. Solondz*, 283 S.C. 36, 320 S.E.2d 720 (Ct.App.1984), and "it is settled law that punitive damages may not be recovered in an equity suit." *Dibble v. Sumter Ice and Fuel Co.*, 283 S.C. 278, 322 S.E.2d 674, 679 (Ct.App.1984). *See also Covert v. Allen Group, Inc.*, 597 F.Supp. 1268, 1270 (D.C.Colo.1984) (Because punitive damages are not recoverable in suits based on breach of contract, exemplary damages will not be awarded under the ancillary theory of promissory estoppel.). Notably, there are no cases in South Carolina in which punitive damages have been awarded in a promissory estoppel case. In addition, punitive damages are only available where defendant's conduct is willful, wanton, or reckless. *Camp v. Components, Inc.*, 285 S.C. 443, 330 S.E.2d 315 (Ct.App.1985); *A.T. Sistance Construction Co.*, 236 S.C. 125, 113 S.E.2d 341 (1960) (Ct.App.1985). As is clear from the

court's earlier discussion, plaintiff has alleged no facts even approaching willfulness, wantonness, or recklessness, on the part of defendant BKC.

25. This figure includes: $580.00 (aerial photographs); $50.00 (demographics); $3,461.00 (civil plans); and $636.00 (legal fees related to lease on Carowinds site).

26. This figure includes the first three items listed in footnote 25.

27. Because the evidence presented demonstrates that plaintiff cannot establish even one of the four essential elements of promissory estoppel in South Carolina, the court need not address plaintiff's Statute of Frauds defense to this cause of action. *See supra* note 23.

28. Notably, South Carolina does not recognize a cause of action for tortious interference with a

has already concluded that plaintiff never had a valid, enforceable contract with BKC. Moreover, even if plaintiff had an enforceable contract with BKC, Woodlo and Fox would have been justified in attempting to procure its termination or breach. As discussed earlier, Woodlo and Fox had every reason to believe that plaintiff's proposed Carowinds restaurant would threaten the economic survival of their nearby Westinghouse location. The uncontroverted evidence indicates that both restaurants intended to draw customers from many of the same areas. *See* BKC exhibits 4 and 22. Wiley Blanton even admitted that Fox and Woodlo were within their rights in protesting plaintiff's proposed Carowinds location. Blanton, 250. Blanton's only complaint was that Fox and Woodlo should have voiced their concerns earlier. Blanton, 251. The undisputed facts, however, establish that plaintiff knew well before submitting its franchise application to BKC (in September, 1985) that Woodlo would be concerned about cannibalization of his Westinghouse restaurant. Nix, 45–46; Rackstraw, 39–40, 69–70. Plaintiff's vice president of operations, Hilliard (a former employee of Woodlo), admitted that he alerted Blanton and Grimm of Woodlo's concerns when he entered plaintiff's employ in 1984. Hilliard, 39–40, 60–61, 66–67, 78. Blanton and Grimm had to admit that they were not surprised by, and in fact anticipated, Fox's complaint. Blanton, 291; Grimm, 170. The undisputed evidence, therefore, clearly establishes that the actions taken by Fox and Woodlo were justifiable. Lastly, plaintiff could not establish any damages caused by the alleged tortious interference. *See supra* discussion at pp. 776–77.

## CONCLUSION

This lengthy order hopefully has revealed this case for what it is—a grudge match of sorts between the personalities involved. The federal courts are not the proper arena for such disputes. Rule 56 was adopted for the very purpose of en-

couraging courts to ferret out cases where plaintiff's claims have no factual basis and dispose of them prior to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). This is such a case. Accordingly, the court grants defendants' motions for summary judgment on all causes of action.

Based upon the foregoing reasoning and cited authorities, this court finds that there are no genuine issues of material fact and that all defendants are entitled to judgment as a matter of law. Rules 56(c), Fed.R.Civ. Proc.

prospective advantage. *Smith v. Holt, Rinehart & Winston, Inc.,* 270 S.C. 446, 242 S.E.2d 548 (1978).